Filed 7/11/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DEBORAH McLEAR-GARY,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>EMRYS SCOTT et al.,<br><br>        Defendants and Respondents. | A146719<br><br>(Mendocino County<br>Super. Ct. No. SCUKCVG 09-54126) |

Deborah McLear-Gary appeals from a judgment declaring her prescriptive and implied easement extinguished by adverse possession. She contends the trial court erred in finding that defendants Emrys Scott, Freyja Scott and Sophia Scott (the Scotts) established an essential element of adverse possession—the "timely" payment of taxes during the five-year statutory period. (See Code Civ. Proc., § 325, subd. (b).)[1] We agree with McLear-Gary that the Scotts' lump sum payment of several years' worth of delinquent property taxes did not constitute "timely" payment of taxes for purposes of section 325, subdivision (b), and therefore the trial court erred in concluding that the Scotts extinguished her easement by adverse possession.

McLear-Gary also challenges the findings of the trial court that (1) the Declaration of Covenants, Codes and Restrictions (CC&R's) governing the properties at issue did not grant her an express easement for pedestrian and vehicular use; and (2) the scope of her prescriptive and implied easement did not include vehicular use. We conclude that

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise stated.

1

substantial evidence supported both findings. Accordingly, we affirm in part and reverse in part the judgment.

**BACKGROUND**

This case involves three parcels of property located within Greenfield Ranch in Mendocino County. In 1972, the owner of Greenfield Ranch, Presa Investment Co. (Presa), subdivided the property into 25 parcels with a minimum acreage of 160 acres each, and one of those initial ranch parcels was subsequently divided by a January 1975 partition judgment into the three parcels at issue here. The parcels sit roughly side-by-side. McLear-Gary is the current owner of the westernmost parcel (parcel 1-A), which she inherited from her late husband, Mark Gary (Gary). Emrys and Freyja Scott are the current owners of the easternmost parcel (parcel 1-C). Marylyn Scott Brandon, Lasara Firefox, Tryntje Young, Tobias Young, and Emrys Scott (the extended Brandon-Scott family), are the current owners of the parcel which is located between parcel 1-A and parcel 1-C (parcel 1-B).

McLear-Gary claims an easement along a skid trail that passes through parcel 1-C, terminates at Jack Smith Creek, and then continues on a foot path over parcel 1-B to her parcel 1-A. In March 2006, Emrys Scott replaced an old wooden gate with a metal gate across the easement route and kept the gate locked, blocking McLear-Gary from accessing the easement across parcel 1-C, the Scotts' parcel. On June 22, 2009, McLear-Gary filed a complaint against the Scotts and others to quiet title to her claimed easement. McLear-Gary alleged several theories in support of her easement rights: an express easement pursuant to the governing CC&R's; an implied easement; an easement by necessity; and a prescriptive easement.

In December 2012, McLear-Gary filed a first amended complaint adding the extended Brandon-Scott family as defendants. The Scotts answered the first amended complaint and alleged an affirmative defense that McLear-Gary's "adverse use of the subject road was interrupted and barred by Defendants' maintenance of a gate preventing [McLear-Gary's] use for five continuous years." The extended Brandon-Scott family

2

(other than Emrys and Freyja Scott) did not answer the first amended complaint, and defaults were entered against them.

A bench trial was held on October 27, 28 and 29, 2014. The trial court conducted a site inspection of the properties.

On November 21, 2014, the Scotts moved to reopen the evidence to submit proof of their payment of property taxes on parcel 1-B and parcel 1-C. The Scotts later submitted the tax payment evidence with their closing brief. The evidence showed that the taxes levied and assessed against parcel 1-C were timely paid, but the taxes levied and assessed against parcel 1-B for the years 2005, 2006, 2007 and 2008 were not paid on time and remained delinquent until a lump sum payment was made on April 7, 2011. The parties submitted supplemental briefing on the sufficiency of the tax payment evidence.

In February 2015, the trial court issued a tentative decision in favor of the Scotts. On August 5, 2015, the trial court issued a final statement of decision consistent with the tentative ruling. As pertinent to this appeal, the trial court found that the CC&R's did not grant McLear-Gary an express easement for pedestrian or vehicular use to and from her parcel. While the trial court found that McLear-Gary had established an "exclusively pedestrian" prescriptive and implied easement over the properties belonging to the Scotts and the extended Brandon-Scott family (collectively defendants), the court concluded this easement was extinguished by adverse possession when Emrys Scott, acting for the benefit of the common interests of his cotenants in parcel 1-B, locked and maintained the locked gate across the easement route and otherwise met the requirements for the affirmative defense.

Judgment in favor of the Scotts was entered. McLear-Gary timely appealed.

## DISCUSSION

### I.      Motion to Reopen the Evidence

McLear-Gary contends the trial court abused its discretion in granting the Scotts' motion to reopen the evidence to submit evidence of property tax payments on parcel 1-B and parcel 1-C. She contends the Scotts failed to show good cause for not submitting the evidence during trial and they were not diligent in seeking to reopen the case. The Scotts

3

argue they made a sufficient showing before the trial court that the failure to introduce the tax payment evidence was due to the mistake, inadvertence or excusable neglect of their counsel. According to the Scotts, the evidence showed that their counsel mistakenly believed, based on a discussion with opposing counsel during trial, that the parties would stipulate to the admission of the tax records.

"A request to reopen for further evidence is addressed to the discretion of the trial court whose determination is binding on appeal in the absence of palpable abuse. [Citations.]" (*Guardianship of Phillip B.* (1983) 139 Cal.App.3d 407, 428.) "[A] reviewing court should not disturb the exercise of a trial court's discretion unless it appears that there has been a miscarriage of justice. . . . 'Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)

We conclude it was not unreasonable for the trial court to credit the averments set forth in the declaration of the Scotts' counsel that he inadvertently failed to submit the tax payment evidence during the trial because he was in discussions with opposing counsel to resolve the payment matter by stipulation. Nor was it unreasonable for the trial court to find that the Scotts were diligent in seeking to reopen the case where, as here, counsel promptly notified the trial court and opposing counsel of his omission the day after trial concluded and filed the motion when he returned to work after a medical procedure. There was no miscarriage of justice, as McLear-Gary was able to submit supplemental briefing challenging the sufficiency of the tax payment evidence. We find no palpable abuse by the trial court here.

## II. "Timely" Payment of Taxes for Adverse Possession

McLear-Gary argues that the Scotts were required to prove timely payment of each annual installment of taxes levied on parcel 1-B and parcel 1-C during the statutory period in order to extinguish her easement by adverse possession, and thus, the Scotts' lump sum payment of delinquent taxes for parcel 1-B did not constitute a timely payment. The Scotts contend they were not required to prove payment of any taxes because McLear-Gary's easement was not separately assessed. The Scotts further argue

that they nevertheless satisfied the tax payment requirement by submitting evidence that all taxes assessed against parcel 1-C were timely paid during the statutory period, and that the delinquent taxes on parcel 1-B were paid on April 7, 2011, which was within a continuous five-year period of their adverse possession of the claimed easement.

The resolution of this issue requires that we interpret section 325, subdivision (b) and apply our interpretation to undisputed facts. Section 325, subdivision (b) states, in pertinent part: "In no case shall adverse possession be considered established under the provision of any section of this code, unless it shall be shown that . . . the party or persons, their predecessors and grantors, have *timely* paid all state, county, or municipal taxes that have been levied and assessed upon the land for the period of five years during which the land has been occupied and claimed. Payment of those taxes by the party or persons, their predecessors and grantors shall be established by certified records of the county tax collector." (Italics added.)

### a. Standard of Review

"We review the interpretation and application of a statute to undisputed facts de novo. [Citation.] The rules of statutory interpretation provide that the court's ' "first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. . . . The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation." ' [Citation.]" (*Estate of Kampen* (2011) 201 Cal.App.4th 971, 985–986.)

### b. *Where an easement is not separately assessed, the servient tenement owner must pay property taxes on the servient tenement in order to extinguish the easement by adverse possession.*

Before we take up the issue of the proper interpretation of section 325, subdivision (b), we must first address the Scotts' argument that the California Supreme Court's decision in *Glatts v. Henson* (1948) 31 Cal.2d 368 (*Glatts*) renders irrelevant the requirement of proof of timely payment of taxes in order to extinguish McLear-Gary's interest in the easement in question.

"It is well settled that an easement, regardless of whether it was created by grant or use, may be extinguished by the owner of the servient tenement upon which the easement is a burden, by adverse possession thereof by the servient tenement owner for the required statutory period." (*Glatts*, *supra*, 31 Cal.2d at pp. 370–371.) " 'The elements necessary to establish title by adverse possession are tax payment and open and notorious use or possession that is continuous and uninterrupted, hostile to the true owner and under a claim of title,' for five years. [Citation.]" (*Sevier v. Locher* (1990) 222 Cal.App.3d 1082, 1085.)

In *Glatts*, the owners of property subject to a 30-foot easement brought suit to quiet title to a portion of the easement on the grounds that it was partially extinguished by adverse possession. The court held that the plaintiffs were not required to show payment of taxes on the easement to extinguish part of it by adverse possession because there was a presumption that no taxes were levied or assessed against the easement. (*Glatts*, *supra*, 31 Cal.2d at pp. 371–372.)

As McLear-Gary points out, however, the *Glatts* court specifically noted that the "plaintiffs [had] paid the taxes on their Parcel 4. . . . [P]laintiffs paid taxes on their fee title to the land subject to the easement." (*Glatts*, *supra*, 31 Cal.2d at pp. 370, 371.) Moreover, the court in *Glatts* did not excuse payment of taxes on the ground asserted here by the Scotts. Indeed, in our view, the court's observation that the plaintiffs had paid taxes on their fee title indicates that where an easement is not separately assessed, the payment of property taxes on the servient tenement satisfies the tax payment element

6

for purposes of extinguishing the easement by adverse possession.  In accord with our reading of *Glatts*, respected commentators Miller and Starr explain:  "The owner of a servient tenement *who has paid the taxes on the entire property* does not have to prove payment of any taxes on the easement unless the easement owner establishes that it was separately assessed."  (6 Miller & Starr, Cal. Real Estate (4th ed. 2018) § 15:85, p. 15-309, citing *Glatts*, italics added.)  A contrary conclusion would improperly allow for the adverse possession of an easement without meeting an essential element.

Thus, we conclude the Scotts' reliance upon the rule in *Glatts* is misplaced, and a showing of timely payment of taxes is a precondition to their adverse possession defense.  We now turn to address the issue of whether the Scotts met their affirmative obligation to remit taxes in accord with section 325, subdivision (b).

### c. A lump sum payment of delinquent taxes is not "timely."

McLear-Gary contends the trial court erred when it determined that the Scotts complied with section 325's "timely" payment requirement by making a lump sum payment for the delinquent taxes on parcel 1-B.  The word "timely" is not defined in section 325.  McLear-Gary argues that the plain meaning of "timely" means "not late," "by a given due date," or "[w]ithin the time required by contract or statute."  Citing the Revenue and Taxation Code, McLear-Gary contends that "timely" can be construed as "when due," or in all events, before taxes are "delinquent."  McLear-Gary argues the Scotts' April 7, 2011 lump sum payment was not "timely" under any of these interpretations.

In contrast, the Scotts cite *Devlin v. Powell* (1924) 67 Cal.App. 165 (*Devlin*) and *Owsley v. Matson* (1909) 156 Cal. 401 (*Owsley*) for the position that a tax payment is timely for adverse possession purposes so long as it is made *during any continuous* five-year period of possession.  In *Owsley*, the court held that even where the property is lost to a tax sale due to delinquent taxes, if "a redemption has been made thereof, while the party or his successor in interest was in undisturbed possession and all this is done in good faith, we see no reason why the same should not be held to operate as a payment and we think it is sufficient to bring the occupant within the terms of the statute which

7

requires him to pay the taxes upon the property claimed." (*Owsley*, at p. 405.) Thus, the Scotts argue that the April 7, 2011 lump sum payment was sufficient because it was made within a continuous five-year period of possession from April 2006 to April 2011.

As referenced above, these arguments require us to interpret the meaning of the term "timely" as used in the statute. Notably, the cases relied upon by the Scotts predate the 2010 amendment to section 325, subdivision (b), which went into effect on January 1, 2011. The bill that led to the amendment was Assembly Bill No. 1684 (2009–2010 Reg. Sess.) § 1) Before Assembly Bill No. 1684 was enacted, the statute did not include the word "timely" in addressing the tax payment requirement. McLear-Gary argues that the addition of the word "timely" created a new statutory requirement. Equally plausible, however, is the contention that the Legislature simply codified existing law as stated in *Devlin* and *Owsley* that tax payments must be made during the statutory period. Given this ambiguity, it is appropriate for us to turn to the legislative history of the 2010 amendment to section 325.[2] (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 29.)

Although the legislative history for Assembly Bill No. 1684 does not expressly indicate an intent to supersede *Devlin* and *Owsley*, it is nevertheless clear that the Legislature intended to prevent adverse possessors from satisfying the tax payment requirement with a lump sum payment of delinquent taxes. The Senate Judiciary Committee Analysis of Assembly Bill No. 1684 states in no uncertain terms that "this bill would prevent a party that otherwise meets the criteria for adverse possession from making a one-time payment to satisfy the existing tax requirement."

The Assembly Committee on Judiciary analysis for Assembly Bill No. 1684 further elaborates that the bill was intended to "address[] a problem in which would-be adverse possessors scan tax records for parcels of land with outstanding tax obligations,

---

[2] We previously deferred ruling on McLear-Gary's unopposed motion for judicial notice of the legislative history materials for Assembly Bill No. 1684. We now grant that motion.

make a lump-sum payment of taxes for the previous five years, and then claim that they have occupied the land for that five-year period. . . .  This bill addresses the problem of persons who attempt to make post hoc payments on land with outstanding tax obligations."  To combat this problem, the bill "[p]rovides that annual payment of taxes, which is already a required element of adverse possession in California, must be established by certified records of the county tax collector and show that the taxes were paid *continuously throughout* the five year statutory period."  (Italics added.)  A single lump sum payment of delinquent taxes for previous years—even if made during a five-year period of occupancy in accordance with *Devlin* and *Owsley*—cannot be construed as showing "continuous" payments "throughout" the statutory period.

In its tentative decision, the trial court concluded that the amendment did not change existing law as set forth in *Devlin*, but simply clarified the method for proving tax payments (e.g., by certified records of the tax collector).  Having reviewed the legislative history, however, we find this interpretation to be untenable.  As set forth above, the legislative history makes clear that Assembly Bill No. 1684 had dual purposes: to require proof of payment by certified records of the tax collector; *and* to require that taxes are paid "timely," meaning "continuously throughout" the statutory period.  If the trial court's interpretation were correct, a nonoccupying land speculator could still adversely possess land in the same manner as before the amendment by redeeming tax-defaulted property with a lump sum payment at the end of a claimed five-year period of possession and using a certificate of redemption from the tax collector (see Rev. & Tax. Code, § 4105.2) to satisfy the method of proof requirement.  In other words, this interpretation would lead to the absurd result of rendering the statute ineffective against the very conduct the Legislature sought to prevent.  We must avoid such a construction.  (See *Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1394.)

Under McLear-Gary's more persuasive interpretation of section 325, subdivision (b), adverse possession claimants would be required to establish, by certified records of the tax collector, that they made *timely* payments continuously each year throughout the statutory period.  This interpretation is in harmony with Assembly Bill

9

No. 1684's intended purpose, as well as the law of adverse possession in general, since evidence of such payments would tend to support the adverse possessor's claim of continuous possession over the requisite five years. We think this is the more reasonable interpretation of section 325, subdivision (b).

We also reject the Scotts' argument that the statute, as amended, does not apply to the extended Brandon-Scott family because they are not land speculators but lawful owners of the servient tenements. The statute contains no exceptions and is therefore presumed to apply to all adverse possession claimants. Moreover, the legislative history shows the Legislature's recognition that other types of adverse possessors would be affected by the amendment. The Senate Judiciary Committee analysis of Assembly Bill No. 1684 states: "While there could be a subset of 'legitimate' adverse possessors who are unable to establish title because of one or two late (not timely) tax payments, those individuals would just have to wait until they have made timely payments for a period of five years (provided that all the other requirements were met). As a result, the present structure of the bill encourages the timely payment of taxes for *anyone* who may consider filing a claim for adverse possession." (Italics added.) Certainly, servient tenement owners are not additionally burdened by a requirement that merely overlaps with their preexisting obligation to pay annual property taxes.

The Scotts also contend that applying the 2010 statutory amendment to section 325 in evaluating their adverse possession defense would result in an improper retroactive application of the statute to already-vested rights. We decline to reach the merits of this argument because we disagree with the premise that this case involves vested rights. The five-year statutory period at issue here began to run in March 2006 when Emrys Scott blocked access to the easement. The 2010 amendment took effect *during* the statutory period and before the conditions for adverse possession had been established for the required five-year statutory period. Thus, the Scotts' adverse possession rights were not yet vested at the time the statutory amendment took effect. (See *Marriage v. Keener* (1994) 26 Cal.App.4th 186, 191.)

10

For these reasons, we conclude, based on the language and legislative history of section 325, subdivision (b), that a lump sum payment of delinquent taxes does not constitute "timely" payment of taxes.[3] Thus, the trial court erred in finding that the Scotts satisfied the tax payment element for extinguishing McLear-Gary's easement by adverse possession.

### III. Express Easement

McLear-Gary also challenges the trial court's finding that the CC&R's did not grant her an express easement for pedestrian and vehicular use. Her express easement claim is based on article II, section 2 of the CC&R's, which states that each "owner" shall have a 60-foot wide easement "for ingress and egress to or from any Parcel" and "for pedestrian and vehicular traffic of all manners related to the use and enjoyment of the Property." "Parcel" is defined in the CC&R's as "any forty acres or more of the Property with the exception of the common area," and "owner" is defined as "the record owner, whether one or more persons or entities, of the fee simple title to any Parcel which is a part of the Property." McLear-Gary argues that because she is an owner of a parcel that is more than 40 acres, she is entitled to an express easement for pedestrian and vehicular use across defendants' parcels to the ranch roads.

In rejecting McLear-Gary's interpretation of the CC&R's, the trial court found the term "parcel" was "not clearly defined" due to the lack of maps or legal descriptions. Thus, the trial court looked to the "circumstances surrounding the development and recordation of the [CC&R's]" and concluded that because the CC&R's contemplated the development of a ranch community and did not mention further division of the ranch parcels, the term "parcel" referred only to the first generation of ranch parcels created by

---

[3] We leave open the question of whether "timely" means prior to the due date or the delinquency date. Real property taxes are due and payable in half payments, with the first half installment due on November 1 and the second half installment due on February 1. (Rev. & Tax. Code, §§ 2605–2606.) If unpaid, the first installment is delinquent on December 10, and the second installment is delinquent on April 10. (*Id.*, §§ 2704–2705.) In the case before us, there is no dispute that the taxes on parcel 1-B for years 2005–2008 were long delinquent.

11

Presa, the original owner of Greenfield Ranch. The trial court reasoned that to construe "parcel" to include any parcel of 40 acres or more subsequently created out of the initial ranch parcels would create substantial confusion and "wreak havoc" with residential patterns and improvements on nearby parcels and reasonable expectations of privacy, as the owner of any parcel could demand easement rights across any other parcel to any of the ranch roads. The trial court found that the more reasonable construction of the easement language in the CC&R's was that the easement rights only applied to the initial ranch parcels of 160 or more acres and not to any subdivided parcels that might subsequently be carved out of those ranch parcels.

### a. Standard of Review

As an initial matter, McLear-Gary argues the trial court's interpretation of the written CC&R's presents a pure question of law subject to de novo review. The Scotts contend the applicable standard of review is substantial evidence because the trial court's interpretation of the CC&R's was based not only on the written instrument, but on the testimony of witnesses and the trial court's view of the property during the site inspection.

"An appellate court is *not* bound by a trial court's construction of a contract where (a) the trial court's contractual interpretation is based solely upon the terms of the written instrument *without* the aid of extrinsic evidence; (b) there is *no conflict* in the properly admitted extrinsic evidence; or (c) a [*sic*] the trial court's determination was made on the basis of *improperly admitted* incompetent evidence. [Citation.] By the same token, however, where the interpretation of the contract turns upon the credibility of conflicting extrinsic evidence which was properly admitted at trial, an appellate court will uphold any reasonable construction of the contract by the trial court. [Citation.]" (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 913 (*Morey*).)

We agree with the Scotts that the trial court's interpretation of the CC&R's was not based solely upon the written instrument. As discussed, the trial court looked to the circumstances surrounding the development and recordation of the CC&R's, including the fact that Presa deeded out title to the ranch in residential parcels of 160 acres or more

12

"[i]mmediately following the recordation of the [CC&R's] . . . ." McLear-Gary contends that other evidence—including a 1972 deed from Presa to defendants' predecessors in interest for 80/220 of a parcel, a 1974 agreement between the parties' predecessors in interest, and the 1975 partition judgment—supported a different interpretation. Even so, the trial court's construction of the CC&R's based on conflicting evidence is still subject to deferential review. "[W]here extrinsic evidence has been properly admitted as an aid to the interpretation of a contract and the evidence conflicts, a reasonable construction of the agreement by the trial court which is supported by substantial evidence will be upheld. [Citations.]" (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746–747.) Thus, the applicable standard of review is substantial evidence.

### b. Analysis

" 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' [Citations.] The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. [Citations.]" (*Morey*, *supra*, 64 Cal.App.4th at p. 912.)

Here, the trial court appropriately looked to objective manifestations of the contracting parties' intent, particularly Presa's deeding of the original ranch parcels soon after the recording of the CC&R's. This timing suggested to the trial court that the "parcels" referred to in the CC&R's were the original ranch parcels. We see nothing unreasonable in this inference drawn from the evidence. It was also reasonable for the trial court to consider the "havoc" that McLear-Gary's proposed interpretation of "parcel" would have on the residential patterns of the development and the privacy expectations of other owners. Because the historical evidence of the ranch development and the recording of the CC&R's constituted substantial evidence in support of the trial court's reasonable construction of the CC&R's, the trial court's finding will be upheld.

13

## IV. Scope of the Easement

McLear-Gary also challenges the trial court's conclusion that the scope of her easement was for pedestrian use only. The trial court found that the evidence of "very occasional" vehicular use on the easement was too infrequent and irregular to give notice to defendants of the claimed right for vehicular use. On appeal, McLear-Gary argues that substantial evidence supported her contention that the owners of the servient and dominant tenements intended to allow for vehicular use on her easement.

"The elements necessary to establish a prescriptive easement are well settled. The party claiming such an easement must show use of the property which has been open, notorious, continuous and adverse for an uninterrupted period of five years. [Citations.] Whether the elements of prescription are established is a question of fact for the trial court [citation], and the findings of the court will not be disturbed where there is substantial evidence to support them." (*Warsaw v. Chicago Metallic Ceilings, Inc.* (1984) 35 Cal.3d 564, 570.) "[A]n essential element necessary to the establishment of a prescriptive easement is visible, open and notorious use sufficient to impart actual or constructive notice of the use to the owner of the servient tenement. [Citation.]" (*Connolly v. McDermott* (1984) 162 Cal.App.3d 973, 977.)

McLear-Gary cites the testimony of several associates of her late husband who recounted driving or riding in vehicles on the easement route at various times between the 1970's and 2001. Having reviewed the cited testimony, however, and indulging all reasonable inferences in support of the Scotts as the prevailing parties, we conclude the trial court reasonably inferred from this testimony that vehicles were only occasionally used on the easement. The witnesses were guests and invitees of Gary who testified generally about the frequency of their visits and the use of vehicles on the easement route.

Other evidence supported the trial court's reasonable inference that vehicles were not frequently used on the easement. McLear-Gary testified that she and Gary lived at her property east of defendants' properties from 1984 to 1996, and during that period of time, they spent only 10 to 15 nights at the "wilderness" property on parcel 1-A and

14

usually walked to get there. McLear-Gary further testified that she and Gary lived in Ukiah from 1998 until Gary's death in 2001, and thereafter, McLear-Gary continued to live in Ukiah and visited the wilderness property only seven to eight times per year. The trial court also considered statements that McLear-Gary made in filings in a separate quiet title action that the "only vehicular access route" to her parcel was a prescriptive easement through a different property, not defendants' parcels. The trial court reasonably viewed these statements as inconsistent with her claim of open and notorious use of vehicles on the easement through defendants' properties. Altogether, there was substantial evidence supporting the trial court's finding that the use of vehicles on the easement was very limited and, therefore, insufficient to impart actual or constructive notice to defendants.

McLear-Gary argues it was foreseeable by the parties that the normal evolution and development of parcel 1-A would eventually include vehicular use. In support, McLear-Gary cites a joint application made by the parties in the 1980's to the Mendocino County Planning Department to obtain building permits to construct single-family residences on their parcels, as well as evidence that Gary constructed a cabin on parcel 1-A and a bridge across Jack Smith Creek. According to McLear-Gary, this evidence suggested that the parties envisioned vehicular use to serve a single-family residence on parcel 1-A.

Prescriptive rights "are limited to the uses which were made of the easements during the prescriptive period. [Citations.] Therefore, no different or greater use can be made of the easements without defendants' consent." (*O'Banion v. Borba* (1948) 32 Cal.2d 145, 155.) While the law permits increases in the scope of use of an easement where "the change is one of degree, not kind" (*Cushman v. Davis* (1978) 80 Cal.App.3d 731, 735–736), "an actual change in the physical objects passing over the road" constitutes a "substantial change in the nature of the use and a consequent increase of burden upon the servient estate . . . more than a change in the degree of use." (*Gaither v. Gaither* (1958) 165 Cal.App.2d 782, 785–786.) " 'In ascertaining whether a particular use is permissible under an easement appurtenant created by prescription there must be

15

considered . . . the needs which result from a normal evolution in the use of the dominant tenement and the extent to which the satisfaction of those needs increases the burden on the servient tenement.' " (*Hill v. Allan* (1968) 259 Cal.App.2d 470, 484.) "[T]he question of whether there has been an unreasonable use of an easement is one of fact . . . ." (*Wall v. Rudolph* (1961) 198 Cal.App.2d 684, 696.)

Here, any change in the scope of the easement to include vehicular use would be one of kind, not degree, and substantial evidence supported the trial court's conclusion that the parties did not foresee such a substantial change. The trial court reasonably inferred that the building permit applications did not show a need for vehicular access over defendants' properties to serve a single-family residence, since county records indicated that the cabin Gary constructed was "uninhabitable" not long after it was built. The trial court also noted that while constructing the cabin, Gary hauled materials over another property, not through defendants' parcels. As for the bridge, the trial court reasonably concluded from its own observations that the construction of "little more than stacks of wooden pallets" did not demonstrate intended vehicular use.

Additionally, the trial court observed that the route of the easement was "fairly close" to the Scotts' residence and concluded that expanding the easement's scope to allow for vehicular use could impose an unreasonable burden on the servient tenement owner. This finding, based on the court's firsthand view of the land, further supported its conclusion that the parties did not foresee vehicular use of the easement route due to the increased burden it would cause to the servient tenement.

Accordingly, we find that substantial evidence supported the trial court's conclusion that the scope of McLear-Gary's easement was exclusively pedestrian.

## DISPOSITION

The portion of the judgment finding McLear-Gary's prescriptive and implied easement to be extinguished by adverse possession is reversed. In all other respects, the judgment is affirmed. The case is remanded to the trial court with directions to enter a new judgment consistent with this opinion. The parties shall bear their own costs on appeal.

16

_____
Jenkins, J.

We concur:


_____
Pollak, Acting P. J.


_____
Siggins, J.

A146719/*McLear-Gary v. Scott*

17

A146719/McLear-Gary v Scott

Trial Court:   Superior Court of Mendocino County

Trial Judge:   Richard J. Henderson, J.

Counsel:       Neary and O'Brien, Christopher J. Neary and Jennifer M. O'Brien for
               Appellant.

               Brigham Law Office, Thomas S. Brigham and Brooke A. Brigham for
               Respondents.