Filed 3/9/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| SYED HUSAIN, Plaintiff, Cross-defendant and Appellant, v. CALIFORNIA PACIFIC BANK, Defendant, Cross-complainant and Respondent. | A159067 (San Mateo County Super. Ct. No. 17-CIV-05386) |

Syed Husain appeals from a judgment granting a prescriptive easement over portions of Husain's property on Willow Avenue, Burlingame (the Willow property), a judgment in favor of California Pacific Bank (Bank), the owner of the adjacent property on El Camino Real (the El Camino property).

For at least 50 years, until 2011, the properties were owned by a single owner, most recently by Hana Shiheiber, who acquired them in 2005. Shiheiber allowed tenants of the El Camino property to use portions of the Willow property for access, parking, and garbage removal, and as a garden. Shiheiber defaulted on her mortgage, and in 2011, the properties were sold to lienholders, the Willow property to JPMorgan Chase (JPMorgan), and the El Camino property to the Bank. And after those purchases, the Bank and

the tenants of the El Camino property continued to use portions of the Willow property as before.

In 2017, Husain acquired the Willow property and shortly thereafter filed a complaint against the Bank to quiet title. The Bank cross-complained for prescriptive easement. Following a court trial, the court issued a comprehensive statement of decision for the Bank, a decision "[b]ased upon the law and equity and after weighing all the evidence presented." Judgment for the Bank followed, which Husain appeals here, contending that the evidence compelled the opposite conclusion—that the use of the Willow property was permissive and remained permissive unless and until JPMorgan repudiated or revoked that permission. We reject the contention, concluding that the decision of the trial court is sound, it is equitable, and it is supported by the record. We thus affirm the judgment.

## BACKGROUND

### The Properties, Their Ownership, and the General Setting

The El Camino property, at 789 El Camino Real, is a rectangular parcel on which sits the Villa Tuscany Apartments (the Apartments), a large apartment building with an underground garage. The Willow property, at 1507–1509 Willow Avenue, south of the El Camino property, is an L-shaped parcel on which there is a duplex, a concrete parking area, and a large undeveloped area in the rear.

In the 1960s, both properties were owned by Robert and Edith Carpenter. The Carpenters planned an addition to the Apartments, and in January 1964 they obtained a variance from the City of Burlingame that allowed four off-site parking spaces for the El Camino property to be located on the Willow property. The Carpenters never expanded the Apartments, and under the Building Code the variance became void.

The properties changed hands several times over the next decades, always remaining jointly owned, sometimes transferred by the same deed. In 2005, both properties were acquired by Shiheiber, who allowed tenants of the Apartments to use the Willow property, including for access, parking, storage of garbage, and recreational purposes.

In 2010, Shiheiber defaulted on the mortgages and ultimately both properties were sold via trustees' sales, the Willow property to JPMorgan in May 2011, and the El Camino property to junior lienholder Bank in June. As the trial court would later describe it, "Accordingly, as of the summer of 2011, for the first time in over 50 years, the two properties were not under common ownership."[1]

We digress briefly from the chronology of ownership to note Shiheiber's response to JPMorgan's complaint to foreclose. That response was a cross-complaint in which Shiheiber alleged among other things that JPMorgan (identified in the cross-complaint as "Chase") "has attempted to misappropriate and trespass upon real property over which it holds no security interest, including, without limitation the parking spaces on the parcel adjacent to the [El Camino] property and backyard of the [Willow] property"; that "Chase and/or its agents advertised the backyard and other portions of the adjacent Willow Avenue property as part of the premises of the 789 El Camino property available for use and enjoyment by the tenants of the 789 El Camino property"; that "Chase and/or its agents misappropriated

---

[1] Husain asserts that "[t]here was no evidence at trial that the tenants were even told the properties were no longer jointly owned." To the contrary, on June 16, 2011, the day the Bank purchased the El Camino property, the tenants received an official notice from the court-appointed receiver advising that the Bank now owned the property and had hired one Janet Husary to be its on-site manager.

3

parking spaces allocated to the Willow property, thereby interfering with the Willow tenants' use and enjoyment"; and that "Shiheiber did not give permission for the entry and/or the entry exceeded any permission."[2] The cross-complaint concluded that "the actions alleged above constitute trespass onto the land owned by Shiheiber and over which Chase does not hold a security interest and/or which was not part of the 789 El Camino property."

With the two trustee sales in 2011, JPMorgan and the Bank became the owners of the respective properties, which ownership remained the same until the Willow property was sold to Husain on July 31, 2017—a sale closed against the background that Husain was aware that the Bank claimed a prescriptive easement over the Willow property. Specifically:

On June 25, 2017, during his preliminary communications with real estate broker Coldwell Banker Real Estate LLC, Husain was presented with a "Visual Inspection Disclosure" that had an entire page devoted to usage issues at the Willow property and the Bank's prescriptive easement claim. The disclosure notes that the tenants were parking on the Willow property and using the driveway to access the Apartments, and that "[t]he neighboring apartment building claims there is a prescriptive easement on the property's lot for use by [the] tenants." Husain signed the disclosure.

Then, as negotiations continued, JPMorgan insisted that Husain sign a "Hold Harmless Agreement," which he did, acknowledging that JPMorgan had informed him about various issues, including a non-conforming use, a parking space dispute, and pending lawsuits with the former owner involving ownership issues. This agreement required Husain to indemnify and hold

---

[2] The trial court took judicial notice of the allegations in Shiheiber's cross-complaint, not for proof of the truth of the allegation that the tenants were trespassing but for the fact that the cross-complaint put JPMorgan on notice of the fact that Shiheiber was asserting trespass.

4

JPMorgan harmless from any claims or demands arising in any way out of any issues relating to the "parking issue described above." Husain's signature on this agreement was notarized on July 27, 2017.

JPMorgan then provided Husain with a more detailed description of the easement claimed by the Bank, this in an "Indemnification and Hold Harmless Agreement" Husain signed in late July 2017, just before the close of escrow. The Indemnification and Hold Harmless Agreement contains an attachment titled "Potential Easement Issues," and describes the Bank's prescriptive easement claim over the Willow property, setting forth in detail the factual basis for that claim.[3]

---

[3] The agreement provides in pertinent part: "Additionally, to Seller's understanding, that [*sic*] Willow Property and the El Camino Property previously shared a common ownership, and occupants of the El Camino Property were and have been allowed to use parking spaces at the Willow Property. It is Seller's further understanding that use of parking spaces at the Willow Property by the tenants or other occupants of the El Camino Property continues through the present. [¶] Based on the City of Burlingame's March 23, 2016 Memorandum, Seller is also aware of a driveway issue . . . . [T]he driveway used to access both the Willow Property and the El Camino Property straddles the property line and there is no known cross-access agreement recorded. [¶] Additionally, it is Seller's understanding that the tenants and other occupants of the El Camino Property may be, and may have historically been, using the Willow Property for other uses. For example, to Seller's understanding, the trash bins used by the tenants and other occupants at the El Camino Property may be located in a fenced area on the Willow Property. Additionally, the picnic tables and barbeques that the El Camino Property tenants and occupants use may be free standing on the Willow Property. [¶] Based on the historical use and development of the two properties, the owner of the El Camino Property has previously stated that it believes it has a prescriptive easement over the Willow Property and/or other legal rights with respect to the Willow Property. Seller believes that Buyer is currently aware of these issues . . . . Buyer is on notice to conduct its own due diligence and legal review of all of these issues."

Against that background, Husain's purchase of the Willow property closed on July 31, 2017.

As indicated above, when Shiheiber owned the properties, the tenants in the Apartments were allowed to use portions of the Willow property, which portions included the driveway, garbage bins, eight parking spaces, and a garden. Not only was this allowed, the fact is that the only access for vehicles to enter and exit the underground garage is via the driveway. Moreover, the sprinkler system for the garden on the Willow property is located in the garage of the Apartments.

Such use continued after the Bank purchased the El Camino property in June 2011, the Bank and the tenants using the Willow property for access, parking, garbage storage, and recreation, the last of which included maintaining a garden, a barbeque, and a picnic area—which use led to the litigation here.

**The Proceedings Below**

In November 2017, Husain filed a complaint to quiet title against the Bank. The Bank filed an answer and a cross-complaint for prescriptive easement, quiet title, and declaratory relief. Husain filed his answer to the cross-complaint, and the issue was joined.

In July 2019, the case came on for trial before the Honorable Nancy Fineman, a trial which occurred over three court days, included within which was a site visit by Judge Fineman. As she would describe it, the critical issue was "whether the Bank has a prescriptive easement or some other right to use portions of [the] property now owned by Husain. These areas are: (1) a driveway; (2) four parking spaces which were identified in a variance . . . ; (3) four other parking spaces; (4) a garbage area; and (5) a garden."

Following her visit to the site, Judge Fineman heard evidence about those items, which revealed the following:

### The Driveway

During the six years that JPMorgan owned the Willow property, the tenants of the Apartments, their guests, vendors, and repair persons used the driveway that straddles the boundary between the two properties, a driveway, as noted, providing the only way to access the underground parking at the Apartments as well as the outdoor parking spaces. Such use was "substantial and constant," perhaps as many as 100 times a day.

### The Parking Spaces

As with the driveway, the Bank, the tenants, and their visitors used the eight parking spaces daily. The use of the parking spaces was consistent and frequent, so much so that essentially every photograph of the parking spaces introduced at trial shows cars parked in the spaces. In addition to using the parking spaces, the Bank maintained them, keeping them clean and free of trash, at one point installing a retaining wall in front of the spaces to prevent the accumulation of dirt and debris.

### The Garbage Area

During the years JPMorgan owned the Willow property, the "tenants used the garbage area on a daily basis for trash and recycling and that the garbage trucks came onto the Willow property to collect the tenants' trash and recyclables two times a week for the entire five-year period." This use of the garbage space was, like all other uses of the Willow property, clearly visible, as shown by the testimony, the photographs, and the site visit. And just as it did with the parking spaces, the Bank maintained the garbage bins.

***The Garden***

During the years JPMorgan owned the Willow property, the Bank maintained the garden at the rear of the Willow property for the enjoyment of the tenants, beginning shortly after it purchased the El Camino property when the Bank made substantial improvements to the garden, clearing out weeds, cutting down trees, repairing the sprinkler system, bringing in topsoil, and purchasing flowers and plants, spending over $4,000 in the first few months.

After this initial renovation, the Bank continued caring for the garden and picnic area, mowing the grass, purchasing more plants, trees, and flowers, weeding the flower beds, trimming bushes, and watering. The Bank had a gardener attend to this portion of the Willow property on a weekly basis, and also ensured that it was watered at the Bank's expense. Indeed, there was evidence that at no time prior to trial did Husain do anything to care for the garden or picnic area, all of which was done by the Bank.

Judge Fineman summed this up with her findings as to the garden: "At trial, there was no dispute over the boundaries of the garden, or evidence or arguments by Husain regarding his use of the garden. At trial, Husain only attempted to minimize the tenants' use of the garden, but Husary, who has been managing the El Camino property since 2011, testified that she and her children used the garden regularly as did the other tenants. [Citation.] Among the recreational uses being made of the garden are relaxing, barbequing, picnicking, playing and other leisure activities. The tenants also enjoy the roses, fruit trees, and other plants in the garden. [¶] Further, the Bank paid for extensive landscaping, gardening service, and water for the garden. [Citations.] Significantly, the controls for the irrigation system were

in the underground garage of the apartment. [Citations.] JPMorgan did not have the means to use the sprinklers to water its own property."

Finally, the evidence was undisputed that at no time did the Bank ever request permission to use the Willow property.

On July 24, Judge Fineman issued a tentative decision in favor of the Bank. Following a proposed statement of decision, and a stipulation modifying the statutory deadlines, on September 17, Husain filed his objections to the proposed statement. Judge Fineman requested further briefing, which was received, and on October 22, Judge Fineman issued her final statement of decision. It was a comprehensive, 16-page decision that, as discussed in more detail below, found that the continued use of the Willow property after the Bank's acquisition of the El Camino property was constructive notice of adverse and hostile use sufficient to create a prescriptive easement. And, she concluded, the Bank and its tenants have a nonexclusive prescriptive easement over the use of the driveway, the eight parking spaces, the garbage area, and the garden.

Judgment was entered on October 24, from which Husain filed a timely appeal.

## DISCUSSION

### The Law of Prescriptive Easement

To establish a prescriptive easement the party claiming it must show use of the property that has been "open, notorious, continuous, and adverse for an uninterrupted period of five years." (*Warsaw v. Chicago Metallic Ceilings, Inc.* (1984) 35 Cal.3d 564, 570; *Applegate v. Ota* (1983) 146 Cal.App.3d 702, 708; CACI 4901.) " '[A]n essential element necessary to the establishment of a prescriptive easement is visible, open, and notorious use sufficient to impart actual or constructive notice of the use to the owner

9

of the servient tenement.' " (*McLear-Gary v. Scott* (2018) 25 Cal.App.5th 145, 159.)

Two other divisions of this court have elaborated on the concept of "adverse." Division Four said that the " 'term "adverse" in this context is essentially synonymous with "hostile" and " 'under claim of right.' " [Citations.] A claimant need not believe that his or her use is legally justified or expressly claim a right of use for the use to be adverse. [Citations.] Instead, a claimant's use is adverse to the owner if the use is made without any express or implied recognition of the owner's property rights. [Citations.] In other words, a claimant's use is adverse to the owner if it is wrongful and in defiance of the owner's property rights. [Citation.]' [¶] 'To be adverse to the owner a claimant's use must give rise to a cause of action by the owner against the claimant. [Citations.] This ensures that a prescriptive easement can arise only if the owner had an opportunity to protect his or her rights by taking legal action to prevent the wrongful use, yet failed to do so.' " *McBride v. Smith* (2018) 18 Cal.App.5th 1160, 1181 (*McBride*). And Division One: " 'adverse use' means only that the claimant's use of the property was made without the explicit or implicit permission of the landowner." (*Aaron v. Dunham* (2006) 137 Cal.App.4th 1244, 1252.)

The existence or nonexistence of each of the elements of a prescriptive easement is a question of fact. (*Twin Peaks Land Co. v. Briggs* (1982) 130 Cal.App.3d 587, 593.) As the Supreme Court put it, "Whether the use is hostile or is merely a matter of neighborly accommodation, however, is a question of fact to be determined in light of the surrounding circumstances and the relationship between the parties." (*Warsaw v. Chicago Metallic Ceilings, Inc., supra*, 35 Cal.3d at p. 572.) The burden of proof as to the elements of a prescriptive easement is on the one asserting the claim, here,

the Bank. And as to that burden, it is, as Judge Fineman held, and as the parties agreed, clear and convincing evidence. (*Grant v. Ratliff* (2008) 164 Cal.App.4th 1304, 1310; *Applegate v. Ota*, *supra*, 146 Cal.App.3d at p. 708.)[4]

**The Standard of Review**

Citing *Hansen v. Sandridge Partners, L.P.* (2018) 22 Cal.App.5th 1020, 1028, Husain asserts that the standard of review is de novo, on this basis: "As applicable here, because Mr. Husain does not challenge the trial court's factual findings, whether those facts create the prescriptive easements found by the trial court is reviewed as a matter of law."

We disagree for several reasons, beginning with the fact that Judge Fineman exercised her equitable powers, as she expressly noted at trial and in her statement of decision. For example, during closing arguments Judge Fineman observed that "the real decisions are equitable," and "that all these issues that I am deciding—sitting as the Court in equity, so I can do equity"—a sentiment, we note, with which counsel for Husain concurred. Judge Fineman began the "Standard of Proof" portion of her statement of decision confirming that "The parties agree that this Court is sitting as a Court of equity in deciding this matter. As such, the Court may exercise its discretion to resolve the matter as long as its decision falls within the permissible range of options set by the legal criteria."

Judge Fineman then analyzed the cases cited by the parties, reviewed the evidence at trial, and weighed the equities before finding clear and convincing evidence "that the Bank has a prescriptive easement over the

---

[4] One case is contrary, holding that the burden of proof is preponderance of the evidence. (*Vieira Enterprises, Inc. v. McCoy* (2017) 8 Cal.App.5th 1057, 1074.)

11

driveway, the eight parking spaces, the garbage area, and the garden." And doing so, she concluded as follows: "Based upon the law and equity and after weighing all the evidence presented, the Court finds that the Bank did not have to provide actual notice, but that constructive notice based upon its use of the property put the owner of the Willow property, JPMorgan, on notice for the five-year period from 2011–2016, was sufficient."

And she went on: "The case law supports this interpretation," citing *Oglesby v. Hollister* (1888) 76 Cal. 136, where a cotenant obtained adverse possession without providing actual notice to the other cotenant, and which, as Judge Fineman described it, "states that the cotenants' adverse use can be inferred by hostile acts: 'Where a possession commences with the consent of the owner, which is the presumption when one tenant in common is in sole possession, there can be no disseisin or adverse possession until there has been a disclaimer by the assertion of an adverse title, and notice thereof to the owner, either direct or to be **inferred** from notorious acts.' *Oglesby*, *supra*, 76 Cal. at p. 141 (emphasis added.) Further, the *Oglesby* court puts the burden on the subservient co-tenant to be attentive to his/her rights. (*Id.* at p. 142.) [¶] There is no justification in law or equity to carve out an exception to the general rule to require actual and not constructive notice for property that was once under common ownership."

In light of this, another holding by our colleagues in Division Four is apt, this in *Richardson v. Franc* (2015) 233 Cal.App.4th 744, 751: "After the trial court has exercised its equitable powers, the appellate court reviews the judgment under the abuse of discretion standard. [Citation.] 'Under that standard, we resolve all evidentiary conflicts in favor of the judgment and determine whether the trial court's decision " 'falls within the permissible range of options set by the legal criteria.' " ' " In *Richardson*, the trial court

12

had granted respondent an "irrevocable parol license" to "improve landscaping irrigation, and lighting within [a] 30' wide and 150' long easement." (*Id.* at p. 750.)  The Court of Appeal affirmed, specifically highlighting the equitable power of the trial court and its "broad discretion in deciding the type of equitable relief to fit a case's particular circumstances," succinctly concluding that "the trial court is better equipped than we are to fashion equitable relief and we afford it considerable discretion." (*Id.* at p. 758; accord *Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 771.)

Husain does not attempt to show any abuse of discretion in the classic sense, that is, that the decision " 'is so irrational or arbitrary that no reasonable person could agree with it.  [Citation.]' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)  Rather, his position is that the question was essentially a legal one, compelled by Husain's claim that he does not contest the facts.  The argument is premised on the basis that before JPMorgan acquired the Willow property, the use of that property by the tenants on the El Camino property was "permissive," and that such use remained permissive unless and until JPMorgan repudiated or revoked that permission.  As Husain's reply brief distills it, "[A] permissive use remains permissive for purposes of prescription, even if the properties change ownership, until it is expressly and unequivocally revoked or repudiated," which repudiation, Husain claims, must be "unqualified and definite."

In support of his argument, Husain relies primarily on three cases that he asserts applied this principle even after the properties involved changed hands:  *Madden v. Alpha Hardware & Supply Co.* (1954) 128 Cal.App.2d 72 (*Madden*); *Kaler v. Brown* (1951) 101 Cal.App.2d 716; and *Brandon v. Umpqua Lumber & Timber Co.* (1914) 26 Cal.App. 96 (*Brandon*).  As Husain

13

would have it, "Each of these cases thus involved—just like the present case—a use permitted by a former owner which continued unquestioned despite one or both of the properties changing hands. The rule they set is clear: where use of property begins permissively, the continuation of that use remains permissive for purposes of adverse possession until the permission is clearly and unequivocally repudiated. Permission does not terminate simply because the properties changed hands, even, as in *Madden*, across multiple owners. (*Madden*, *supra*, 128 Cal.App.2d at p. 75.) Clear, express repudiation is required to make a formerly permissive use hostile. (*Brandon*, *supra*, 26 Cal.App. at p. 98.)"

We are not persuaded, as the cases are distinguishable, as Judge Fineman aptly noted: none of the cases involved common ownership of the involved properties.

A leading California commentary states the rule this way: "Because a person cannot have an easement on his or her own property, the time period during which the servient and dominant tenements are held in common ownership is not counted in calculating the prescriptive period." (6 Miller & Starr, Cal. Real Estate (4th ed. 2020), Easements, § 15:38, p. 15-157.)

This concept is supported by Civil Code section 805, that "A servitude thereon cannot be held by the owner of the servient tenement." As one court of appeal described it, this statute "prevents a landowner from holding an easement on his own land. . . . [T]his rule proceeds from the rationale that a person does not need an easement in his or her own land because all the uses of an easement are already included in the general right of fee ownership." (*Beyer v. Tahoe Sands Resort* (2005) 129 Cal.App.4th 1458, 1473.) Or as this court put it over 100 years ago: "So long as the entire tract . . . remained in one ownership there could be no such thing as a dominant and servient

14

tenement between different portions of the tract." (*Oliver v. Burnett* (1909) 10 Cal.App. 403, 408; accord *Edgar v. Pensinger* (1946) 73 Cal.App.2d 405, 412 [where parts of lots were "in one ownership and there could be no dominant and servient tenements"].)

While no California case addresses the precise issue in a prescriptive easement situation, an Arizona case does, a case we find persuasive: *Brown v. Ware* (1981) 630 P.2d 545. There, the Browns owned two adjacent lots, on one of which was their home. They built a dirt road from their home across the other lot to the street, which they used to access their home. In 1954, the lot adjacent to the one on which the home was located was sold, without any easement for the road, and the Browns continued to use the road. Over the next decades, the adjacent lot was sold several times, including to Mr. Battershell, Mr. Mason, and finally to the Ameighs. (*Id.* at p. 546.)

In 1978, Mr. Ameigh put debris on both ends of the road, and the Browns sued, seeking a declaration they had a prescriptive easement. The trial court ruled against the Browns, holding that the use of the road had been with the permission of the original owners, which use continued to be permissive through two successive owners thereafter. (*Brown, supra,* 630 P.2d at p. 546.) The Court of Appeal reversed, holding that there could be no permissive use during the period when the title to the entire tract is in one owner. (*Id.* at p. 547.) And absent evidence that any of the owners of the adjoining lot had given the Browns permission to drive across their lot to reach the street, there was no permissive use. This was the holding:

"During the period when the title to the entire tract was in one owner there could be no adverse use. [Citations.] Therefore, the period of time necessary to establish adverse use cannot commence until at least 1954 when

15

the land over which the road had been established was conveyed to Battershell. Then, for the first time since establishment of the road, there were two different estates, one claiming it was dominant and the other servient. [¶] . . . [¶]

"There is no evidence concerning any permission, implied, express, or otherwise, from Battershell for the use of the road. The evidence, however, is undisputed that the Browns and their successors in title continued to use the road commencing immediately after that sale. This use was clearly open, visible, and continuous to June 12, 1978, when [Ameigh] attempted to close the road.

"Mason was the succeeding owner of the servient land after Battershell. There is no evidence that he, at any time, permitted the use. In fact, the only evidence is to the contrary. He attempted to close the road by stringing barbed wire in 1964. When he sold to appellees in 1974, he told appellee Ameigh that he had tried to close the road at one time. Lastly, there is no evidence of consent from appellees. The only evidence on this issue is contrary, i.e., their act of closing the road for 25 hours. Thus from 1954 to the commencement of this action, a total of some 24 years there has been continuous, open, hostile, and visible use of the road.

"Although the trial court was correct that the original owner of the entire tract created the road, there is no evidence showing permission by any owner of the servient land after it was first conveyed into separate ownership. We find that its use thereafter was adverse to the owners and that an easement by prescription was established." (*Brown, supra*, 630 P.2d at p. 547; see also *Ryan v. Tanabe Corp.* (1999) 37 P.3d 554, 561 [plaintiffs precluded from acquiring a prescriptive easement based on their use of a driveway during common ownership because "the prescriptive period does not

16

begin to run until the unity of ownership of the dominant and servient tracts is severed"].)

But beyond this, Husain's "permission" argument fails for additional reasons, including that it proceeds from a fundamental premise belied by the record here, that use of the property was at all times permissive. While it is apparently the case that Shiheiber had at one point given permission, that position changed in the course of the foreclosure proceedings, as manifest by her cross-complaint against JPMorgan that alleged "trespass," certainly a "cause of action" contemplated by the reference in *McBride*. (*McBride*, *supra*, 18 Cal.App.5th at p. 1181.) And while it may be the case, as Husain asserts, that the tenants were never notified of Shiheiber's position, the fact is that JPMorgan was—and it became the owner of the servient property.

Indeed, the issue of "permission" did not even arise until the Willow property was purchased by JPMorgan and the El Camino property by the Bank, and the facts undisputedly establish the Bank never requested or received permission from JPMorgan to use the Willow property, and simply used the property as it did, a use that was open, notorious, continuous, and hostile for more than five years.

An additional reason why Husain's "permission" argument fails is the rule set forth in *Richardson v. Franc*, *supra*, 233 Cal.App.4th 744. By way of background, the Bank asserted that the tenants' use of the Willow property was pursuant to a license, a fact the Bank contends was admitted by Husain in his response to the Bank's summary judgment motion.[5] And, the Bank's

---

[5] Husain's response included the following: "These uses began as far back as 1964, when the two properties were owned by Carpenter, and continued while the properties were both owned by Shiheiber, presumably through a license granted to the tenants by the owner. [¶] . . . [¶] While an owner may not have a need or ability to grant himself a license to use his own

17

argument runs, such license was revoked when the Willow property was conveyed to JPMorgan, which was the holding of *Richardson* noting exactly that: " 'a conveyance of the property burdened with a license revokes the license.' " (*Id.* at p. 751, citing 6 Miller & Starr, Cal. Real Estate (3d ed. 2006) Easements, §15:2, pp. 15-10 to 15-11; see generally *Shaw v. Caldwell* (1911) 16 Cal.App. 1, 8.)

We end the discussion on this issue with the observation that even accepting Husain's claim that he "does not challenge the trial court's findings"—a claim the Bank disputes— his appeal must fail because the issue is one of fact. That it is was recognized throughout by Husain himself, beginning in 2018 with his opposition to the Bank's summary judgment motion, where Husain argued that "Whether one's use of another's property is adverse or with the owner's permission or license is a question of fact for the trial court or jury. [Citations.] Here in the absence of express notice that the previous permissive nature of the tenants' use was now adverse, there is a disputed issue of material fact as to whether the use changed so substantially as to constitute notice to the owner of the Willow property that the prescriptive period was now running."

Husain's trial brief was similar, observing at one point that "whether one's use of another's property is adverse or with the owner's permission or license is a question of fact for the trial court or jury." And that was the position of Husain's counsel in closing argument, who said "that's why we take into account the totality of the circumstances here, that these

---

properties, he certainly can grant a license to third parties to use them, making their use permissive in nature. A license is defined as a personal, revocable, and nonassignable permission or authority to do an act or acts on land of another."

18

improvements preexisted and continue, and they look like the same whether they are permissive or adverse in nature."

The "totality of the circumstances" indeed, the very analysis Judge Fineman made here. In her words, "Whether a prescriptive easement exists is a question of fact to be decided 'after an examination of all the surrounding circumstances, including the relation of the parties, their conduct, the relative location of the properties, and other factors.' (6 Miller & Starr, Cal. Real Estate (4th ed. 2019) [Easements, § 15:32].)"

So, whether that question of fact is decided on conflicting facts, or even undisputed facts, that fact question was decided against Husain and must be affirmed under the rule of conflicting inferences by which we must indulge all reasonable inferences in favor of the Bank, the party that prevailed below. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632–1633.) Particularly apt here, where Husain's essential position is that the facts are undisputed, the conflicting inference rule pertains even if the facts were undisputed. (*Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 913; *McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1102.) And, we add, the rule applies even where, as here, a court issues a statement of decision. (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1531.)

Judge Fineman made various "findings," specifically noting that her statement did not set out "all the facts supporting [her] decision, but the ones the court finds the most material." These findings included the ownership history of the properties; the tenants' use of the Willow property; the lack of any notice provided by the Bank to Husain's predecessor of the Bank's interest in the Willow property; and Husain's knowledge of the Bank's claim to a prescriptive easement prior to the time he purchased the property. Each

19

of those findings, as well as the additional findings contained in the "Analysis" and "Conclusion" sections of the statement of decision, was supported by specifically cited items of evidence.

Husain cannot transmute the issue into a question of law simply by asserting that he is not presently disputing Judge Fineman's factual findings. Nor can the question of permissive use be resolved solely by determining whether the tenants continued use of the Willow property while both properties were owned by Shiheiber. Rather, Judge Fineman had to consider the "surrounding circumstances," including the change in ownership and the relationship between the Bank and JPMorgan. As Justice Traynor put it, where the evidence is "susceptible to conflicting inferences—that the use was permissive and a matter of neighborly accommodation, or that the use of the [property] over a [five]-year period without asking permission adequately demonstrated a claim of right to do so," is a question of fact. (*Taormino v. Denny* (1970) 1 Cal.3d 679, 687.) That question of fact, decided by Judge Fineman acting as a court of equity, " 'falls within the permissible range of options set forth by the legal criteria.' " (*Richardson v. Franc*, *supra*, 233 Cal.App.4th at p. 751.)

One final observation is apt on this equitable case, the fact that Husain was fully aware of the claim of prescriptive easement, from his receipt of the initial disclosure through his signing of the indemnification agreement. As Judge Fineman concluded, "While it may seem unfair for Husain to be subjected to an easement which was obtained before he purchased the property, JPMorgan put him on notice, including obtaining a hold harmless agreement, and therefore he was on notice of the claim. [Citations.] Husain also testified that he knew he was taking a risk in purchasing the property that it was subject to an easement."

20

## DISPOSITION

The judgment is affirmed.  The Bank shall recover its costs on appeal.

_____
Richman, Acting P.J.

We concur:

_____
Stewart, J.

_____
Miller, J.

*Husain v. California Pacific Bank* (A159067)

| | |
|---|---|
| Trial Court: | San Mateo County Superior Court |
| Trial Judge: | Honorable Nancy Fineman |
| Attorney for Plaintiff and Appellant Syed Husain: | Wagstaffe, von Loewenfeldt, Busch & Radwick LLP, Michael von Loewenfeldt |
| Attorney for Defendant and Respondent California Pacific Bank: | Wilke Fleury LLP, Matthew W. Powell. |