Filed 6/26/25  Miser v. Stureman CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| RICHARD MISER, as Trustee, etc., et al., | C100172 |
| Plaintiffs, Cross-defendants and Respondents, | (Super. Ct. No. CVCV20-0194255) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING |
| MARC STUREMAN et al., | |
| Defendants, Cross-complainants and Appellants. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the nonpublished opinion filed herein on June 6, 2025, be modified as follows:

On page 6, first sentence in the last paragraph on that page, the words "successor-in-interest" are deleted and replaced with "predecessor-in-interest" so the sentence now reads:

> In support of their motion for summary adjudication, defendants argued it was undisputed their predecessor-in-interest had recorded a notice (i.e., the

1

affidavit of posting) in 1967 that substantially complied with Civil Code section 813, and this notice had never been revoked.

There is no change in the judgment.

The petition for rehearing is denied.


BY THE COURT:


_____/s/_____
EARL, P. J.


_____/s/_____
DUARTE, J.


_____/s/_____
BOULWARE EURIE, J.

Filed 6/6/25  Miser v. Stureman CA3 (unmodified opinion)

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| RICHARD MISER, as Trustee, etc., et al., | C100172 |
| Plaintiffs, Cross-defendants and Respondents, | (Super. Ct. No. CVCV20-0194255) |
| v. | |
| MARC STUREMAN et al., | |
| Defendants, Cross-complainants and Appellants. | |

Defendants Marc and LouAnn Stureman appeal from a judgment finding plaintiffs have an irrevocable license to use Sand Pit Road, a gravel road that cuts through the Sturemans' property and is located approximately 15 feet from their front door.  We affirm.

1

Because this is an appeal from a judgment following a bench trial, our recitation of the facts construes the evidence in the light most favorable to the judgment. (See *Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 765 [" 'In general, in reviewing a judgment based upon a statement of decision following a bench trial, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision" ' "].)

*1. The Properties at Issue*

Defendants own an approximately 10-acre parcel of property located near the intersection of Highway 299 and Cassel Road in a rural part of Shasta County (defendants' property). To the west of defendants' property is the Oak Knoll Subdivision, which consists of seven large lots. Lot 1 of the Oak Knoll Subdivision is owned by plaintiffs Richard and Joann Miser (as trustees of the Richard and Joanne Living Trust), and the eastern boundary of the Miser property abuts the top half of the western boundary of defendants' property. About half a mile north of defendants' property is the Taylor Private Road Subdivision (Taylor Subdivision), which consists of 17 approximately two-acre lots. The remaining 17 plaintiffs live in the Taylor Subdivision. The area between defendants' property and Taylor Subdivision is undeveloped government-owned land. Several maps showing defendants' property, the Oak Knoll Subdivision, and the Taylor Subdivision were admitted at trial.

A dirt (or gravel or cinder) road historically referred to as Sand Pit Road runs diagonally through the western half of defendants' property, across the northeast corner of the Miser property, and then continues north up to the Taylor Subdivision.[1] Defendants'

---

[1] Like the trial court, plaintiffs, both experts, and most of the maps introduced into evidence at trial, we will refer to this dirt road as Sand Pit Road, although we acknowledge defendants refer to it as their driveway and they contend Sand Pit Road now

expert testified Sand Pit Road has been in existence since at least the late 1950's, and plaintiffs' expert testified it has been in existence since at least the 1940's.

A second road runs along the western boundary of defendants' property and joins Sand Pit Road where it crosses the northeast corner of the Miser property. This road is partially paved, and we will thus refer to it as the paved road. The paved road is approximately 10 feet wide (about the width of one car). As discussed below, there is evidence that this road (or a precursor to this road) was put in around 1979 (although it was not paved until later), and an aerial photo taken in 1981 shows both roads in existence.

A tract map creating the Taylor Subdivision was approved in 1965. At that time, Highway 299 was (and still is) the nearest public road, and Sand Pit Road was the only road leading from Highway 299 to the subdivision. Without access to Sand Pit Road, the subdivision was thus landlocked. Plaintiffs' expert testified there was no "legal access" or "deeded access" to the subdivision, and it appeared the developer "just utilized the existing road" (i.e., Sand Pit Road) because it "had a long history in existence" and "the use of the road was just common up there." Defendants' expert agreed that Sand Pit Road was the only access to the subdivision when it was created.

The Oak Knoll Subdivision and defendants' property were initially part of an 80-acre tract that was owned by the Fruit Growers Supply Company (Fruit Growers). In 1967, Fruit Growers recorded a document titled "Affidavit of Posting" that stated it had "caused to be posted at each entrance to the property hereinafter more particularly described, a sign bearing the following language: 'Right to pass by permission, and

---

refers to a different road that runs along the western edge of their property (which we refer to as the "paved road"). Regardless of what the road is called, the issue is whether the trial court properly found plaintiffs have an irrevocable license to use it. As defendants themselves note, the labels used are not controlling.

3

subject to control, of owner:  Section 1008, Civil Code."[2]  The larger tract (or at least the portion of the larger tract that ultimately became defendants' property) was one of the properties described in the affidavit.

In 1975, Fruit Growers sold the 80-acre tract to Howard and Patricia Duff. Defendants' expert, Stephen Dean, surveyed the tract for the Duffs in 1977.  His record of survey shows just three roads within the tract's boundaries:  (1) Highway 299; (2) Cassell Road, which goes south from Highway 299; and (3) Sand Pit Road (labeled "Existing Dirt Road") which goes north from Highway 299.  Dean testified that, at the time he did his survey, Sand Pit Road was still the only road leading to the Taylor Subdivision.

In 1979, the Duffs split the 80-acre tract into three parcels, including a 10-acre parcel that we are referring to as defendants' property, and a 40-acre parcel that ultimately became the Oak Knoll Subdivision.  That same year, the Duffs granted the 10-acre parcel to the Inter Mountain Christian School, and a school was built on the property sometime thereafter.  In 1983, the Inter Mountain Christian School granted the 10-acre parcel to the Grace Community Church, which continued to operate the school.  At some point, the school closed, but the record does not reflect when.

In 2002, the Duffs sold the 40-acre parcel to David Gilmore and Michael and Teresa Pasternak, and in 2004, Gilmore and the Pasternaks recorded a "final map" establishing the Oak Knoll Subdivision.  The final map shows Sand Pit Road in its current location, and a "tentative map" shows both Sand Pit Road and the paved road in their current locations.  Around the same time the Oak Knoll Subdivision was established, Grace Community Church granted Gilmore and the Pasternaks a 60-foot

---

[2]     Civil Code section 1008 provides, "No use by any person or persons, no matter how long continued, of any land, shall ever ripen into an easement by prescription, if the owner of such property posts at each entrance to the property or at intervals of not more than 200 feet along the boundary a sign reading substantially as follows:  'Right to pass by permission, and subject to control, of owner:  Section 1008, Civil Code.' "

4

easement running along the western edge of defendants' property, and the paved road lies within this easement. Plaintiffs' expert testified this easement was "created specifically for the Oak Knoll subdivision" and was "for the exclusive use . . . of the residents of the Oak Knoll Subdivision," and defendants' expert provided no contradictory testimony.[3] Plaintiffs' expert also testified (again without contradiction) that he was unable to find any deed granting the residents of Taylor Subdivision the right to use the paved road.

Defendants purchased their property from the Grace Community Church in 2017. They converted the school into a home, and in November 2019, shortly after they moved in, they blocked access to Sand Pit Road and directed people to use the paved road. It was blocking access to Sand Pit Road that spawned this litigation.

### 2. *Procedural History*

In January 2020, plaintiffs filed a complaint against defendants seeking to quiet title to either a prescriptive easement or an equitable easement to use Sand Pit Road. They also sought damages for nuisance. Defendants filed a cross-complaint seeking to quiet title to all adverse claims plaintiffs made against their property and damages for nuisance.

Defendants moved for summary adjudication on the prescriptive easement cause of action based on Civil Code section 813 and the affidavit of posting that was recorded in 1967. Briefly, an easement is an interest in land belonging to another that gives the holder of the easement the right to use the land. (*Moylan v. Dykes* (1986) 181 Cal.App.3d 561, 568.) An easement may be created in a number of ways, including by prescription.

---

[3] Defendants appear to acknowledge as much in their reply brief when they state the subdivision's developers "obtained from Grace Community Church . . . a grant . . . giving the entire subdivision property a 60-foot (60') wide nonexclusive easement for private road . . . purposes along the western boundary of the Stureman property," and this "easement legally benefitted all the land of the Oak Knoll Subdivision." Both experts testified there was nothing preventing defendants from granting others the right to use this easement.

(*Hansen v. Sandridge Partners, L.P.* (2018) 22 Cal.App.5th 1020, 1032.) " 'The elements necessary to establish a prescriptive easement are well settled.  The party claiming such an easement must show use of the property which has been open, notorious, continuous *and adverse* for an uninterrupted period of five years.' " (*McLear-Gary v. Scott* (2018) 25 Cal.App.5th 145, 159, italics added.)  "[A] prescriptive right cannot be predicated on a permissive use" because "[w]hen the use is permissive it cannot be adverse." (*Irvin v. Petitfils* (1941) 44 Cal.App.2d 496, 501-502.)

Civil Code section 813 gives a landowner a way to "effectively protect his or her property against loss by prescription." (6 Miller & Starr, Cal. Real Estate (4th ed. 2024) Easements, § 15.36 (Miller & Starr).)  It provides, "The holder of record title to land may record . . . a description of said land and a notice reading substantially as follows:  'The right of the public or any person to make any use whatsoever of the above described land or any portion thereof . . . is by permission, and subject to control, of owner:  Section 813, Civil Code.'  [¶]  The recorded notice is conclusive evidence that subsequent use of the land . . . is permissive and with consent in any judicial proceeding involving the issue as to whether . . . any user has a prescriptive right in such land or any portion thereof." (Civ. Code, § 813.)  Because a prescriptive easement cannot be established if use of the land is permissive, recording a notice pursuant to section 813 prevents use from ever ripening into a prescriptive easement.

In support of their motion for summary adjudication, defendants argued it was undisputed their successor-in-interest had recorded a notice (i.e., the affidavit of posting) in 1967 that substantially complied with Civil Code section 813, and this notice had never been revoked.  They also argued this recorded notice constituted conclusive evidence plaintiffs' use was permissive, which negated an essential element of their

prescriptive easement claim. The trial court agreed and granted the motion. Plaintiffs did not appeal this order, and its propriety is thus not before us.[4]

After the trial court granted defendants' motion for summary adjudication as to the prescriptive easement cause of action, plaintiffs filed a motion to amend the complaint to add a cause of action seeking to establish they had an irrevocable license to use Sand Pit Road, and defendants did not oppose the motion. The trial court granted the motion, and the case proceeded to trial on plaintiffs' irrevocable license, equitable easement, and nuisance causes of action, and on defendants' cross-complaint.

3. *The Evidence at Trial*

A two-day bench trial was held. Rather than calling all 19 plaintiffs, the parties stipulated that three or four plaintiffs would testify about their use of Sand Pit Road and the paved road and their testimony would "be considered representative of all named Plaintiffs." Eight witnesses testified: Plaintiffs Catherine Schmidt, James Cimaglia, John Rodman, and Richard Miser; defendant LouAnn Stureman; Howard Duff; Frank Lehman (plaintiffs' expert); and Stephen Dean (defendants' expert). The relevant portions of the experts' testimony has been noted above.

As noted, Duff at one time owned both defendants' property (which he transferred to Inter Mountain Christian School in 1979) and the property that became Oak Knoll Subdivision (which he transferred to Gilmore and the Pasternaks in 2002). Duff testified that, before he transferred defendants' property to the Inter Mountain Christian School, he had a new dirt road put in along its western boundary in order to route traffic off what

---

**4**      Plaintiffs argue the affidavit of posting was invalid because it failed to substantially comply with Civil Code section 813. We do not consider this argument because, as noted, the trial court found otherwise when it granted defendants' motion for summary adjudication and plaintiffs did not appeal that order. (See *Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 320 [where party did not appeal order granting summary judgment, it could not challenge propriety of order on appeal].)

would be school grounds. He explained, "the kids would be out there playing around, so we put the new road in . . . on [the] property line[] instead of cutting through a lot." He testified the new dirt road was in the approximate location of the paved road. He also testified he never communicated with anyone living north of defendants' property or told them they could use the new road. After he transferred the property to the school he did not know who used Sand Pit Road, and prior to this litigation he had not been out to the area since the late 1980's.

Catherine Schmidt testified her parents bought property in the Taylor Subdivision in 1971 or 1972 and she lived there as a teenager. She moved out in 1975 or 1976 but continued to visit her parents almost every day until she bought her own property in the subdivision in 1997. Before defendants blocked access to it, she always used Sand Pit Road to access both her parents' property and her property, and she never used the paved road (indeed, she testified she had "never noticed" the paved road). The court asked, "You never used [the paved road] to access your property?" and she responded, "I thought [the paved road] was private property. Why would I trespass on somebody else's property?" She testified she never asked anyone for permission to use Sand Pit Road, and explained, "I didn't realize I needed to have permission. . . . Sandpit Road was always known to be where Sandpit Road is now, and I'd always used it." She observed her neighbors, delivery drivers, construction vehicles, and emergency vehicles used Sand Pit Road to access the Taylor Subdivision.

Schmidt's daughter went to the Inter Mountain Christian School in 1981 and 1982, and she testified the people who ran the school never prevented her from using Sand Pit Road or told her she could not use it. Defendants' attorney asked her whether the school had ever blocked access to Sand Pit Road, and she responded she was aware of one occasion when "the school came out and put a barricade, it was a sawhorse they put across it, and several of the residents back in Taylor subdivision came out, instructed them that this is the only way we have to come and go, why are you doing this. And it

8

was Pastor Landers at that time. He apologized. He said he wasn't aware. That the church had told him he could do it. And so he pulled the barricades back. And that was—it lasted maybe an hour or two." She explained she heard about this incident from her parents and "it happened when I wasn't there."

Schmidt built a 1,900-square-foot home on her property in 2005. She also built a 900-square-foot home for her mother in 2009. The builders used Sand Pit Road to access the property. Schmidt testified she relied on being able to use Sand Pit Road when building both homes. She also testified the residents of the Taylor Subdivision each contributed around $120 a year to maintain Sand Pit Road. Since defendants blocked access to Sand Pit Road, she has used the paved road to access her property.

James Cimaglia has lived in the Taylor Subdivision since 2016. His realtor told him his property was accessed via Sand Pit Road. He asked the realtor about the paved road and was told it "was a private road." Based on what his realtor told him, he assumed "it was certified or legal" to use Sand Pit Road to access his property. He testified he never asked for or was given permission to use Sand Pit Road because "I believed it was my right to use that road and that's what I was also told by my realtors," and "I thought it was a right-of-way for everyone to use." He testified he would not have bought his property if he could not use Sand Pit Road because "I wouldn't have had any access to my house." Before defendants blocked it, he "always" used Sand Pit Road to access his property, as would family members and friends who came to visit. He observed his neighbors, delivery trucks, and emergency vehicles using Sand Pit Road. He paid $100 into the "road maintenance fund" when he first moved in. He has used the paved road to access his property since defendants blocked Sand Pit Road.

John Rodman has lived in the Taylor Subdivision since 2006. He testified that when he first looked at the property, he "followed the real estate agent" over Sand Pit Road and his "understanding was that was our road that we . . . used to access our property." Until it was blocked off, he used Sand Pit Road to access his property.

9

Friends and guests used Sand Pit Road when visiting him. His neighbors have always used Sand Pit Road to access their properties as well. He has seen delivery vehicles and emergency vehicles use Sand Pit Road to access the Taylor Subdivision. He testified he would occasionally talk to people from the church that used to own defendants' property and they never told him he could not use Sand Pit Road. He contributed about $120 a year to the fund that was used to maintain Sand Pit Road. Like Schmidt and Cimaglia, he testified nobody ever gave him or denied him permission to use the road, and "[i]t was just the normal road." Since defendants blocked access to Sand Pit Road, he has used the paved road to access his property.

Richard Miser bought his lot in Oak Knoll Subdivision in 2004 and built a house that was finished in 2009. He was a half-time resident until 2015 and has lived there full time since then. He accesses his property via the paved road, which he "thought was my private driveway." Before defendants blocked access to it, he observed the Taylor Subdivision residents using Sand Pit Road to access their properties. He also observed others using Sand Pit Road to access the Taylor Subdivision, including delivery vehicles and visitors.

LouAnn Stureman testified she and her husband purchased the property with plans to convert the school into their personal residence. They visited the property several times before purchasing it, and she observed people driving or "zooming" "quite fast" up and down Sand Pit Road during their visits. She asked their realtor if this was normal, and he said he was not sure. During one of these visits, Henry Winkelman, the minister of the church, was present when several vehicles drove by and kicked up a lot of dust. Stureman stated she did not want to purchase the property unless Sand Pit Road could be "closed off" and Winkelman told her it could "definitely . . . be closed off any time we wanted." She testified she and her husband would not have purchased the property if they could not close Sand Pit Road to through traffic. She acknowledged, however, that

10

they purchased the property with knowledge of the use of Sand Pit Road, and that they observed vehicles continuing to use Sand Pit Road after they purchased it.

Stureman testified that after she and her husband purchased the property in 2017, they spent between $250,000 to $300,000 converting the school into a home, and they moved in sometime in 2019, once the conversion was complete. Sand Pit Road is about 15 feet from what is now their front door.

In early October of 2019, Stureman and her husband posted signs where Sand Pit Road enters and exits their property that stated: "Private Drive [¶] Road Closing On [¶] 11/3/2019 [¶] Please Use [¶] Paved Road [¶] Thank You." On or about November 1, someone taped a note on their door that stated: "This road is our designed right of way. [¶] . . . [¶] Our understanding is that this road has Prescriptive Rights. It has been in use since the 1960's. You may want to check with your legal advisor. [¶] The small road you wish us to use is unsafe for daily use. It needs widening. And the . . . land owners of Oak Knoll Subdivision need to approve our use of their property." The Sturemans blocked access to Sand Pit Road several days later.

### 4. *The Trial Court's Statement of Decision and Judgment*

In October 2023, the trial court issued a thorough statement of decision finding in favor of plaintiffs on the irrevocable license and nuisance causes of action,[5] and against defendants on their cross-complaint. As to the irrevocable license cause of action, the trial court found (1) plaintiffs had implied permission to use Sand Pit Road to access their properties because defendants and their predecessors tacitly permitted or acquiesced in such use for decades, and (2) plaintiffs purchased their properties and, in the case of Schmidt, built homes thereon in reliance on that permission. The trial court also found

---

[5] After the conclusion of the bench trial, but before the statement of decision and judgment were issued, plaintiffs dismissed their equitable easement cause of action.

11

defendants' obstruction and blocking of Sand Pit Road constituted a nuisance, and it awarded plaintiffs $1,000 in damages.

Judgment was entered granting plaintiffs an irrevocable license to use Sand Pit Road and awarding them $1,000 on their nuisance cause of action. The judgment specifies plaintiffs have an "irrevocable license" to use Sand Pit Road, and "[t]his judgment will be recorded in the Shasta County Recorder's Office wherein the irrevocable license will be placed on title for Defendants' property for the benefit of Plaintiffs and their successors in interest." This appeal followed.

## DISCUSSION

We note at the outset that all of defendants' arguments are directed at the trial court's decision granting plaintiffs an irrevocable license, and none are directed at its decision regarding the nuisance. In their reply, defendants implicitly confirm they make no separate arguments regarding the nuisance, and instead argue only that "if there is no license . . . there can be no nuisance." We thus do not discuss the nuisance cause of action further.

"We review the trial court's ultimate decision to grant an irrevocable license and the duration of that license for an abuse of discretion, but review any subsidiary factual findings for substantial evidence and any subsidiary legal questions de novo." (*Shoen v. Zacarias* (2019) 33 Cal.App.5th 1112, 1118 (*Shoen*).)

*1. The Law on Irrevocable Licenses*

Because it lies at the heart of this appeal, we begin with a summary of the law on irrevocable licenses. At its most basic, a license constitutes *permission* to do something that, without such permission, would be unlawful. (See Black's Law Dict. (6th ed. 1990) p. 920, col. 1 [defining license as "permission . . . to do an act which, without such permission, would be illegal, a trespass, a tort, or otherwise not allowable"]; Bruce & Ely, The Law of Easements and Licenses in Land (2025) Licenses in Land, § 11.1 ["A license is the permission to do something on the land of another that, without such authority,

12

would be unlawful"].)  "Permission sufficient to establish a license can be express or implied."  (*Richardson v. Franc* (2015) 233 Cal.App.4th 744, 755 (*Richardson*).)  With respect to real property, "A license gives authority to a licensee to perform an act or acts on the property of another pursuant to the express or implied permission of the owner.  The licensee has a personal privilege but does not possess either an interest or right in the land or any estate in the property."  (6 Miller & Starr, *supra*, § 15:2; see also *Jenson v. Kenneth I. Mullen Co.* (1989) 211 Cal.App.3d 653, 657 ["licensee is a person or entity authorized to do a particular act or acts on the property of another without possessing any estate therein"].)  " 'When a landowner allows someone else to use her land, the owner is granting a license.  [Citation.] . . . [Citation.]  Unlike covenants that run with the land, such as easements, a license is a personal right and confers no interest in land:  '[I]t merely makes lawful an act that otherwise would constitute a trespass.' " (*Gamerberg v. 3000 E. 11th St., LLC* (2020) 44 Cal.App.5th 424, 429 (*Gamerberg*).)

The general rule is that " '[a] licensor . . . can revoke a license at any time without excuse or without consideration to the licensee.' "  (*Richardson*, *supra*, 233 Cal.App.4th at p. 751; see also *Bomberger v. McKelvey* (1950) 35 Cal.2d 607, 618 ["A mere license to enter or use premises may be revoked at any time by the licensor"]; *Gamerberg*, *supra*, 44 Cal.App.5th at p. 429 ["In keeping with a license's permissive nature, ' "[a] licensor generally can revoke a license at any time without excuse or without consideration to the licensee" ' "].)  In certain circumstances, however, a license may become irrevocable.  As relevant here, "a license may become irrevocable when a landowner knowingly permits another to repeatedly perform acts on his or her land, and the licensee, in reasonable reliance on the continuation of the license, has expended time and a substantial amount of money on improvements with the licensor's knowledge.  Under such circumstances, it would be inequitable to terminate the license.  [Citation.]  In that case, the licensor is said to be estopped from revoking the license."  (*Richardson*, at p. 751; see also *Stoner v. Zucker* (1906) 148 Cal. 516, 520 ["where a licensee has entered under a parol license and

13

has expended money, or it is equivalent in labor, in the execution of the license, the license becomes irrevocable"]; *Shoen*, *supra*, 33 Cal.App.5th at p. 1114 [license may become irrevocable if licensee expends substantial amount of money or labor in reliance on the license].) As the above discussion demonstrates, there are two elements to an irrevocable license: (1) permission, which may be express or implied, to use land belonging to another; and (2) a substantial expenditure of money or labor in reasonable reliance on the permission.

Despite its name, an irrevocable license is not necessarily perpetual. (See *Hammond v. Mustard* (1967) 257 Cal.App.2d 384, 388, fn. 2 [irrevocable license does not create a " 'perpetual' right to cross [another's] land"].) In *Stoner v. Zucker*, *supra*, 148 Cal. at page 520, our Supreme Court explained when a "license becomes irrevocable, the licensee will have a right of entry upon the lands of the licensor for the purpose of maintaining . . . his rights under his license, *and the license will continue for so long a time as the nature of it calls for*." (Italics added; see also *Shoen*, *supra*, 33 Cal.App.5th at pp. 1123-1124 [trial court abused its discretion in making an irrevocable license perpetual because "license should remain irrevocable ' "for a period sufficient to enable the licensee to capitalize on his or her investment" ' "].) A license thus remains irrevocable "only as long as justice and equity require its use." (6 Miller & Starr, *supra*, § 15.2.)

 2. *Defendants' Arguments*

As noted above, there are two elements to an irrevocable license: (1) permission to use land; and (2) substantial expenditures in reliance on that permission. Most of defendants' arguments focus on the first element (i.e., permission), and they never discuss the second element or the trial court's findings thereon. Indeed, they state "the *primary* finding of the trial court of implied 'permission' . . . is not supported by substantial evidence. The *secondary* issue of whether such a license is revocable or irrevocable is essentially irrelevant, because the threshold factual issue [i.e., of implied permission] was

14

never met." We take this as an acknowledgement that defendants only challenge the trial court's finding regarding implied permission.

> *A. Substantial evidence supports the trial court's finding plaintiffs had implied permission to use Sand Pit Road*

As the trial court accurately noted, "Permission sufficient to establish a license can be express *or implied*." (*Richardson*, *supra*, 233 Cal.App.4th at p. 755, italics added.) " ' " An implied license is one which is presumed to have been given from the words, acts or passive acquiescence of the party authorized to give it." ' " (*Zellers v. State* (1955) 134 Cal.App.2d 270, 273.) An implied license, or implied permission, " 'may consist of acts indicative of a consent by the actor to the use of his land by another, or it may consist in failure to take reasonable action when inaction may reasonably lead to an inference of consent.' " (*Ibid*.) Permission may thus be implied by " 'acquiescence in acts already done,' " such as, for example, when a landowner knows someone is using a road on his land and "fail[s] to object" " 'under such circumstances that objection might well have been expected had there been no assent.' " (*Richardson*, at p. 755.) And again: "A license may be created by . . . acquiescence (that is, by 'tacitly permit[ting] another to repeatedly do acts upon the land' 'with full knowledge of the facts' and without objecting)." (*Shoen*, *supra*, 33 Cal.App.5th at p. 1119.)

Applying this legal authority to the evidence introduced at trial, the trial court found plaintiffs had *implied permission* to use Sand Pit Road based on the fact that they had openly used it for decades to access their properties without objection from any of the various owners of defendants' property, or, to quote the trial court, "defendants[] and their predecessors had allowed or acquiesced in the use of Sandpit road since at least the sixties." The trial court spent five pages discussing the evidence that supported this finding. Defendants never mention or discuss the bulk of this evidence.

As noted, we review the trial court's factual findings for substantial evidence. (*Shoen*, *supra*, 33 Cal.App.5th at p. 1118.) The substantial evidence standard is

15

deferential. " 'In viewing the evidence, we look only to the evidence supporting the prevailing party. [Citation.] We discard evidence unfavorable to the prevailing party as not having sufficient verity to be accepted by the trier of fact. [Citation.] Where the trial court or jury has drawn reasonable inferences from the evidence, we have no power to draw different inferences, even though different inferences may also be reasonable. [Citation.] The trier of fact is not required to believe even uncontradicted testimony. [Citation.]' " (*Felgenhauer v. Soni* (2004) 121 Cal.App.4th 445, 449.) We find substantial evidence supports the trial court's finding that plaintiffs had implied permission to use Sand Pit Road. This is particularly true where, as here, defendants barely discuss the evidence, and they never explain why substantial evidence does not support the trial court's finding of implied permission. "An appellant challenging the sufficiency of the evidence to support the judgment must cite the evidence in the record supporting the judgment and explain why such evidence is insufficient as a matter of law. [Citations.] An appellant who fails to cite and discuss the evidence supporting the judgment cannot demonstrate that such evidence is insufficient." (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408.) Here, defendants fail to cite or discuss the evidence that supports the judgment and they thus "cannot demonstrate that such evidence is insufficient." (*Ibid.*)

Defendants make two arguments about the trial court's finding that plaintiffs had implied permission to use Sand Pit Road, neither of which persuades.

First, defendants argue the trial court improperly relied on the affidavit of posting that was recorded pursuant to Civil Code section 813 to establish permission. As noted above, section 813 provides (1) a landowner may record a notice that describes a particular piece of land and states the right to use the land is by permission, and (2) the recorded notice "is conclusive evidence that subsequent use of the land . . . is permissive." Defendants argue that, as a matter of statutory construction, the recorded notice "does not grant either *actual or implied permission* to . . . use the owner's land."

16

Relatedly, they argue the trial court, "relied solely on a *statute*—Section 813—to find 'permission' " and if you "[t]ake away this erroneous legal conclusion . . . there is no substantial evidence of implied permission." Whatever we think of defendants' argument in the abstract, it is irrelevant because the trial court did not rely on the affidavit of posting or section 813 to find permission. Instead, the trial court expressly stated, "the Affidavit of Posting is not necessary to the court's analysis, as it is not required in order to establish an irrevocable license," and it went on to find implied permission based on decades of acquiescence.

Second, defendants argue the trial court's finding of implied permission contradicts admissions plaintiffs made during discovery. In particular, each plaintiff admitted that their "use of that portion of Sandpit Road located on the Stureman property has never been by permission." Defendants argue plaintiffs are bound by their admissions, and those admissions conclusively negate an essential element of their irrevocable license cause of action—namely, that their use of Sand Pit Road was by permission.

It is true that parties are generally bound by their admissions. (See Code Civ. Proc., § 2033.410, subd. (a) ["Any matter admitted in response to a request for admission is conclusively established against the party making the admission in the pending action, unless the court has permitted withdrawal or amendment of that admission"].) However, simply noting that parties are bound by their admissions does not end the inquiry because, "a trial court retains discretion to determine their scope and effect. An admission of a fact may be misleading. In those cases in which the court determines that an admission may be susceptible of different meanings, the court must use its discretion to determine the scope and effect of the admission so that it accurately reflects what facts are admitted in the light of other evidence." (*Fredericks v. Kontos Industries, Inc.* (1987) 189 Cal.App.3d 272, 277.) Moreover, a trial court has "discretion to admit evidence to elucidate and explain an admission, because the admission of a fact does not always

17

reflect the party's reasonable understanding of that fact." (*Id*. at p. 278.) "Through the court's discretion to admit evidence that explains the scope and effect of such an admission, the court ensures that the request for the admission is not misused as a device to hide or confuse issues." (*Ibid*.) Here, the trial court found plaintiffs' admissions were not inconsistent with a finding they had implied permission to use Sand Pit Road, and we conclude it did not abuse its discretion in so finding.

Catherine Schmidt was asked on direct examination whether she recalled "responding to that discovery that you have not had permission to use Sandpit Road," and she replied, "Yes." She explained, "I didn't realize I needed to have permission. . . . Sandpit Road was always known to be where Sandpit Road is now, and I'd always used it. I never realized I needed permission." She further confirmed that, when responding to discovery, she meant that she "never asked for or received permission to use Sand Pit Road." The trial court then asked Schmidt, "When you were answering those [discovery] questions, were you intending to provide a legal conclusion or just the facts as you knew them?" She responded, "Just the facts as I knew them." James Cimaglia and John Rodman provided similar testimony.

On cross-examination, defense counsel asked Schmidt the following question: "In fact, your use of Sandpit Road over the years has been with the mindset that you've never had permission to use Sandpit Road; isn't that correct?" She responded, "No, that's not correct. I never realized I had to have permission. It's been there and it's been used." Defense counsel then read the request for admission and Schmidt's response into the record as a prior inconsistent statement, but the trial court found the admission was not inconsistent with her testimony: "That is not a prior inconsistent statement. I believe that is her testimony today, that's consistent with that." "My understanding of her testimony was, she had never asked for permission to use Sandpit Road, never been given permission to use it, never with permission, didn't think she had to have permission because it's been there, it's been used. She admitted that it was never with permission."

18

As noted, "Permission sufficient to establish a license can be express or implied." (*Richardson*, *supra*, 233 Cal.App.4th at p. 755.) Plaintiffs' admissions may well establish they did not have express permission to use Sand Pit Road, but those admissions do not necessarily establish they did not have implied permission, which can be established by showing acquiescence or a failure to object. (See *ibid*. ["When a landowner knowingly permits another to perform acts on his land, a license may be implied from his failure to object"]; *Zellers v. State*, *supra*, 134 Cal.App.2d at p. 273 [implied permission may be found based on a landowner's " 'failure to take reasonable action when inaction may reasonably lead to an inference of consent' "].) The trial court found plaintiffs had implied permission to use Sand Pit Road because they had used it for decades without objection by either the various prior owners of defendants' property, or by defendants themselves. This finding is not inconsistent with plaintiffs' admissions.

B.      *A notice recorded pursuant to Civil Code section 813 does not defeat an irrevocable license cause of action*

As noted above, when it granted defendants' motion for summary adjudication, the trial court found defendants' predecessor had recorded a notice (the affidavit of posting) that substantially complied with Civil Code section 813, and this recorded notice conclusively established plaintiffs' use of Sand Pit Road was permissive, which negated an essential element of their prescriptive easement claim and thus defeated that claim. Defendants argue this recorded notice also defeats plaintiffs' irrevocable license claim as a matter of law. We disagree.

Civil Code section 813, by its plain terms, deals with prescriptive rights in land.[6] In particular, it provides a "recorded notice" that substantially complies with section 813 "is conclusive evidence that subsequent use of the land . . . is permissive . . . in any

---

[6]     Civil Code section 813 also deals with dedication of land for public use, which is not at issue here.

judicial proceeding involving the issue as to . . . whether any user has a *prescriptive right* in such land." (Italics added.) Defendants argue section 813 should be interpreted as preventing a user from acquiring not just a prescriptive easement, but also from acquiring an irrevocable license. By its plain terms, however, section 813 refers to a "prescriptive right" to use land, and the only prescriptive right to use land of which we are aware is a prescriptive easement. There is no language in section 813 that suggests it applies to a license, revocable or otherwise, and we are aware of no California authority referring to a license as a prescriptive right. In this regard, we note that three California treatises on real property mention section 813 only in their discussion of prescriptive easements, not in their discussion of licenses, which suggests the treatise authors believe that section is not relevant to analysis of a license claim. (6 Miller & Star, *supra*, § 15.36, p. 15-152; see also 12 Witkin, Summary of Cal. Law (11 ed. 2017) Real Property, § 466; 28 Cal.Jur.3d (2025) Easements and Licenses, § 45.) We also note that Civil Code section 813 was enacted in 1963, and California courts had recognized as early as 1906 that a license could become irrevocable if the licensee expended a substantial amount of money or time in reliance on the license. (*Stoner v. Zucker*, *supra*, 148 Cal. at p. 520; see also *Cooke v. Ramponi* (1952) 38 Cal.2d 282.) As plaintiffs accurately note, "the Legislature is presumed to know about existing case law when it enacts or amends a statute." (*In re W.B.* (2012) 55 Cal.4th 30, 57.) If the Legislature had intended for Civil Code section 813 to apply to irrevocable licenses as well as prescriptive easements, it would have said so.

Moreover, the affidavit of posting that was recorded in this case makes clear it only defeats a prescriptive easement. It states "a sign" was "posted at each entrance" to the property "bearing the following language: [¶] 'Right to pass by permission, and subject to control, of owner: Section 1008, Civil Code.'" Civil Code section 1008, in turn, provides, "No use by any person or persons, no matter how long continued, of any land, *shall ever ripen into an easement by prescription*, if the owner of such property

20

posts at each entrance to the property or at intervals of not more than 200 feet along the boundary a sign reading substantially as follows: 'Right to pass by permission, and subject to control, of owner: Section 1008, Civil Code.' " (Italics added.) What this particular recorded notice thus did was prevent use from ever ripening into a prescriptive easement, not an irrevocable license.

Citing Black's Law Dictionary, defendants argue the word "prescriptive" simply means based on long-standing use. Although this is one definition of the word, we note the only example given is "prescriptive easement." (Black's Law Dict. (12th ed. 2024) [defining "prescriptive" as follows: "Based on or determined by ancient custom or long-standing use; having existed for so long as to have become a matter of right <prescriptive easement>"].) To the extent defendants contend this definition demonstrates an irrevocable license is a type of prescriptive right, we disagree, because an irrevocable license is not based on long-standing use—it is based on permissive use plus detrimental reliance.[7]

Defendants argue "an irrevocable license is equivalent to and in effect the same thing as an easement." This is true. Case law teaches that a license that has become irrevocable is "the equivalent of an easement." (*Richardson*, *supra*, 233 Cal.App.4th at p. 751; see also *Shoen*, *supra*, 33 Cal.App.5th at p. 1120 [irrevocable licenses "are functionally indistinguishable from easements"]; *Barnes v. Hussa* (2006) 136 Cal.App.4th 1358, 1370 ["An irrevocable license . . . is for all intents and purposes the equivalent of an easement"].) Defendants then argue that, because an irrevocable license is equivalent to an easement, Civil Code section 813 should be interpreted as preventing the acquisition of both a prescriptive easement and an irrevocable license, but

---

[7]     The fact that the court found implied permission based on long-standing *acquiescence* in plaintiffs' use does not change the fact that an irrevocable license is based on permissive use plus detrimental reliance, not long-standing use.

21

they do not explain why this is so. In any event, we disagree because the elements of a prescriptive easement and an irrevocable license are so different that defeating one claim would not necessarily defeat the other. A party claiming a prescriptive easement " 'must show use of the property which has been open, notorious, continuous and adverse for an uninterrupted period of five years' " (*McLear-Gary v. Scott*, *supra*, 25 Cal.App.5th at p. 159), and, as noted above, " '[u]se with the owner's permission . . . is not adverse,' " (*McBride v. Smith* (2018) 18 Cal.App.5th 1160, 1181). The party claiming an irrevocable license, in contrast, must show permission to use the property and substantial expenditures made in reasonable reliance on that permission. (*Richardson*, at pp. 751-752.) As can be seen, there is almost no overlap in the elements of a prescriptive easement and the elements of an irrevocable license. A prescriptive easement requires use of land for five years without the owner's permission, while an irrevocable license requires use of land with the owner's permission plus detrimental reliance. Thus, while recording a notice pursuant to Civil Code section 813 conclusively establishes use is permissive and thus negates an essential element of a prescriptive easement, it does not negate *any* of the elements of an irrevocable license.

We thus find that recording the affidavit of posting does not defeat plaintiffs' irrevocable license claim, and, indeed, is not relevant to that claim.

C.     *Fraud is not an element of an irrevocable license claim*

Defendants also briefly argue "[e]*stoppel* is the essential basis for finding an irrevocable license," and when "estoppel is applied to land title, the doctrine requires actual or constructive *fraud*" but the trial court "identified no fraud . . . committed by any landowner of the subject property." To the extent they contend actual or constructive fraud is an essential element of an irrevocable license claim, we disagree. The one case they cite to support their argument—*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462—did not involve a license, irrevocable or otherwise.

22

Case law does teach that estoppel is the basis for finding a license is irrevocable, and at least one case—*Cooke v. Ramponi*, *supra*, 38 Cal.2d 282—that discusses an irrevocable license also uses the term fraud.  In that case, our Supreme Court explained, "it is well settled in this state that 'where a licensee has entered under a parol license and has expended money, or its equivalent in labor, in the execution of the license, the license becomes irrevocable, the licensee will have a right of entry upon the lands of the licensor for the purpose of maintaining his structures, or, in general, his rights under his license, and the license will continue for so long a time as the nature of it calls for.'  The principal basis for this view is the doctrine of equitable estoppel; the license, similar in its essentials to an easement, is declared to be irrevocable to prevent the licensor from perpetrating a fraud upon the licensee." (*Id*. at p. 286; see also *Gamerberg*, *supra*, 44 Cal.App.5th at p. 430, quoting *Cooke v. Ramponi*.)  We are aware of no cases, however, that hold fraud is an element of an irrevocable license claim.  *Shoen*, *supra*, 33 Cal.App.5th 1112 contains a thorough explanation of the relationship between estoppel and the law of irrevocable licenses:  "Critically, courts may exercise their power to declare a license irrevocable only if the expenditures in reliance on the license are 'substantial,' 'considerable,' or 'great.' " (*Id*. at p. 1119.)  One of the reasons for this requirement is that "it mirrors a similar requirement in the doctrine of equitable estoppel, the doctrine that forms the 'principal' rationale for our Supreme Court's recognition of a judicial power to declare licenses irrevocable.  [Citations.]  Just as a party seeking to invoke the doctrine of equitable estoppel must prove that she '*seriously . . .* change[d] [her] position in reliance' on the other party's conduct [citations], so too must the party seeking an irrevocable license prove that she seriously changed her position in reliance on the license by showing that her subsequent expenditures were significant." (*Id*. at pp. 1119-1120.)  As these cases and others demonstrate, the critical element that makes an otherwise revocable license irrevocable is substantial detrimental reliance, not fraud. (See *Richardson*, *supra*, 233 Cal.App.4th at p. 751 ["a license may become irrevocable

when a landowner knowingly permits another to repeatedly perform acts on his or her land, and the licensee, in reasonable reliance on the continuation of the license, has expended time and a substantial amount of money on improvements with the licensor's knowledge"]; *Gamerberg*, *supra*, 44 Cal.App.5th at p. 430 [license becomes irrevocable " 'when the licensee, acting in reasonable reliance either on the licensor's representations or on the terms of the license, makes substantial expenditures of money or labor' "].) The trial court found plaintiffs made substantial expenditures in reliance on the license, and defendants do not challenge this finding.

> D.     *Defendants forfeited their argument that the judgment violates the county's setback requirements by failing to assert it at trial*

Defendants complain the judgment is "unlawful" because it violates the setback requirements established by the Shasta County Code.  In particular, defendants argue the Shasta County Code requires buildings to be setback at least 30 feet from any road, but the judgment gives plaintiffs the right to use a road that is located about 15 feet from their front door.  The parties disagree about whether evidence regarding the Shasta County Code was introduced at trial, or whether the code itself should be judicially noticed for the first time on appeal.[8]  Defendants contend evidence of the setback requirements *was*

---

[8]     After this case was fully briefed, defendants filed a request for judicial notice of the relevant county ordinances.  Defendants did not present any of these documents to the trial court.  " 'Reviewing courts generally do not take judicial notice of evidence not presented to the trial court.' [Citation.]  In exceptional circumstances, an appellate court can, but is not required to, take judicial notice of material that was not presented to the trial court in the first instance." (*Adams v. Bank of America, N.A.* (2020) 51 Cal.App.5th 666, 673, fn. 4; see also *Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325-326 ["An appellate court may properly decline to take judicial notice under Evidence Code sections 452 and 459 of a matter which should have been presented to the trial court for consideration in the first instance"].)  Here, defendants present no exceptional circumstances, and we thus follow the general rule and decline to take judicial notice of these documents.

24

introduced at trial when LouAnn Stureman was asked what she called Sand Pit Road, and she responded, "That's my driveway. *According to the County, there is no road there, because you can't have a road next to a building. It has to be more than 30 feet away*." (Italics added.) Defendants also note the "Statement of Conditions" on the Oak Knoll Subdivision map (which was introduced into evidence) states, "Buildings and accessory buildings constructed on parcels one acre or larger shall be setback a minimum of thirty (30) feet from all property lines and road easements." They complain the trial court "ignored" this "crucial" evidence.

If the trial court ignored this evidence, it is because defendants never argued that the location of Sand Pit Road vis-a-vis defendants' home (or the school) violated the county's setback requirements, or that granting plaintiffs an irrevocable license to use Sand Pit Road would be unlawful as a result. " ' "As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried. This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal . . . ." [Citation.] . . . [Citation.] " 'Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider. . . . Bait and switch on appeal not only subjects the parties to avoidable expense, but also wreaks havoc on a judicial system too burdened to retry cases on theories that could have been raised earlier.' " [Citation.]' [Citation.] 'In our adversarial system, each party has the obligation to raise any issue or infirmity that might subject the ensuing judgment to attack. [Citation.]' " (*American Indian Health & Services Corp. v. Kent* (2018) 24 Cal.App.5th 772, 789.) We follow the general rule here and decline to consider this argument because defendants did not raise it in the trial court.

25

*E.    The existence of the paved road does not defeat the judgment*

Finally, defendants argue there is no "rational" or "just" reason to find plaintiffs have an irrevocable license to use Sand Pit Road when they can use the paved road to access their properties, which was " 'intended for use by the plaintiffs and their predecessors since 1979.' " This argument is at least colorable in the abstract. The problem is that it is not supported by either the evidence or defendants' theory at trial.

Plaintiffs' expert testified, without contradiction, that the paved road is located on an easement created for the exclusive use of the Oak Knoll Subdivision and its residents, and that he was unable to find any deed granting the residents of the Taylor Subdivision an easement over defendants' property or a legal right to use the paved road. Plaintiffs testified the only road they ever used to access their properties was Sand Pit Road, and they never used the paved road. Indeed, Catherine Schmidt testified she had used Sand Pit Road since the early 1970's and had "never noticed" the paved road. Because Sand Pit Road was the only road the plaintiffs used, it was also the only road they could establish they had a license to use.[9]

Defendants highlight Duff's testimony that, before he granted defendants' property to Inter Mountain Christian School, he put in a new road along the western boundary in order to route traffic off school grounds, and the road he put in is in approximately the same location as the paved road. This may be true, but Duff also testified he never had any communication with individuals who lived in the subdivision to the north regarding the new road, he never told them he put the road in for them, and he never told them they could use the road. Duff thus never gave anyone express permission to use the new road he put in, and there could be no implied permission based on acquiescence because plaintiffs never used that road. Given the evidence in this case, if plaintiffs wanted to

---

[9]    Sand Pit Road was also the only road over which they could establish a prescriptive easement had that claim not be defeated by the affidavit of posting.

26

secure legal access to their properties, Sand Pit Road was their best, and perhaps only, option.

Defendants' argument that it is not reasonable to find plaintiffs have an irrevocable license to use Sand Pit Road when they can use the paved road is also a new argument raised for the first time on appeal, and it is not how defendants litigated this case in the trial court. In the trial court, defendants took the position that plaintiffs had no right to use either Sand Pit Road or the paved road, and they could instead access their properties via an alternative route identified by their expert, Stephen Dean. Dean testified this route connects the Taylor subdivision to Highway 299, bypasses both the Oak Knoll Subdivision and defendants' property, and is located entirely on government-owned land. Dean also testified the route "is not maintained for use," he drove it in a four-wheel drive in the summer, and a sedan might have trouble driving it due to "rocks and stuff." Plaintiff James Cimaglia testified on rebuttal that he was very familiar with the alternative route, and it is "very rough." He testified, without contradiction, that parts of the route are deeply rutted and it is "basically a four-wheel drive or a UTV, ATV type of road," and even with a four-wheel drive it is "pretty much impassable" in the winter. He was asked whether a sedan could travel over the route and he responded, "In the summer, possibly," but it would be "practically impossible" in the winter and "very, very hard" in the spring because of water from snowmelt. This route is thus not a true alternative.

One final note. Defendants make passing reference in their brief to the fact that, *after* judgment was entered, they granted Shasta County "an easement for ingress, egress, and all road, street or highway purposes, over and across" their property for public purposes. Defendants state this easement is 60-feet wide and runs along the western boundary of their property, which would include the land on which a paved road sits and then some. Their point appears to be that the paved road now provides plaintiffs with a permanent and legal way to access their properties, and there is thus no longer a need for them to use Sand Pit Road. We cannot consider this postjudgment potential turn of

27

events. " '[W]hen reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' " (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) By the same token, we will not consider events that occurred after the judgment was entered.

As noted above, an irrevocable license is not perpetual and lasts "only as long as justice and equity require its use." (6 Miller & Starr, *supra*, § 15.2; see also *Stoner v. Zucker*, *supra*, 148 Cal. at p. 520 [irrevocable license "will continue for so long a time as the nature of it calls for"]; *Shoen*, *supra*, 33 Cal.App.5th at pp. 1123-1124 ["license should remain irrevocable only ' "for a period sufficient to enable the licensee to capitalize on his or her investment" ' "].) Perhaps "justice and equity" no longer require that plaintiffs be permitted to use Sand Pit Road if they have a permanent and legal right to use the paved road. That issue, however, was not raised in the trial court, and we thus have no occasion to opine thereon.

## DISPOSITION

The judgment is affirmed, and plaintiffs are awarded their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


/s/
EARL, P. J.


We concur:


/s/
DUARTE, J.


/s/
BOULWARE EURIE, J.


28